UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CLOSE ARMSTRONG, LLC,

Plaintiff,

v.

TRUNKLINE GAS COMPANY, LLC,

Defendant.

CAUSE NO. 3:18-CV-270 DRL-MGG

CONSOLIDATED WITH:

RANDALL L. DICKSON and JAYMIE L.
DICKSON,

Plaintiffs,

v.

TRUNKLINE GAS COMPANY, LLC,

Defendant.

CAUSE NO. 3:18-CV-494 DRL-MGG

OPINION AND ORDER

This opinion addresses a consolidated case with two sets of landowners filing suit against

Defendant Trunkline Gas Company, LLC. Trunkline filed a summary judgment motion as to both

landowners—Close Armstrong, LLC in one case, and Randall L. Dickson and Jaymie L. Dickson in

the other case. Trunkline currently owns a pipeline that traverses their respective land and claims that

it procured in 1959 a floating easement over the entire two parcels of real property to install future

pipelines or to move its current pipeline. The assertion of these rights today has interfered with the

landowners' desire to place their land within the Agricultural Conservation Easement Program

sponsored by the United States Department of Agriculture. The parties thus seek a judicial declaration

of rights. The case has been bifurcated, so the court addresses here only the existence and efficacy of

the easement rights granted to Trunkline under the right-of-way agreements in this phase I opinion,

leaving questions of equity and the final scope of any easement to phase II.

In the late 1950s, Trunkline and its sole member, Panhandle Eastern Pipe Line Company, wanted to install an underground gas line through hundreds of parcels in Northwest Indiana as part of its proposed installation of a gas transmission pipeline from the Gulf of Mexico to the Michigan border. ECF 81-3 at 2-3. At that time, Trunkline had not determined the exact location or trajectory of its proposed 26-inch diameter high-pressure interstate natural gas transmission pipeline ("100 Line"). *Id.* ¶¶ 3-10. As a result, Trunkline and Panhandle approached the then-property owners of the land, seeking easements across their property to lay the pipes. *See Panhandle E. Pipe Line Co. v. United States*, 408 F.2d 690, 694-95 (Fed. Ct. Cl. 1969). Trunkline was able to obtain identical right-of-way agreements with the various property owners. ECF 81-3 ¶ 4; ECF 81-4, 5, 6. The agreements covered a swath of land approximately one mile wide (ECF 94 at 5) (*see* Image 1 and 2 below).



**Image 1**



**Image 2**[1]

The plaintiffs in both cases are successors in interest to the real property that Trunkline acquired an easement through for the 100 Line. *See* ECF 81-22 ¶ 11; ECF 76-1, Ex. A ¶ 2. The Dicksons purchased their property (depicted above as property #8) in 2013 with the intent to grant an Agricultural Conservation Easement to the United States Department of Agriculture (USDA). ECF 81-22 ¶ 5. It appears Close Armstrong acquired its property (depicted as property #11) sometime after the company's formation in January 2017. ECF 76-1, Ex. A ¶ 2, 4-5. Both the Dicksons and Close Armstrong want to grant the USDA an Agricultural Conservation Easement. *See* ECF 93 at ¶ 34; ECF 78 ¶¶ 38-40.

A conservation easement "is a deed restriction landowners voluntarily place on their property to protect resources such as productive agricultural land, ground and surface water, habitat, historic

---

[1] Trunkline moved to strike the exhibit that contains this image (ECF 76-1, Ex. B-B), but did so only on the basis that the map contains unauthenticated handwriting (*see* ECF 98 at 15). The court is using this map only for illustrative purposes here.

sites or scenic views." Am. Farm. Trust, *Agri. Conserv. Easements* (2016), https://s30428.pcdn.co/wp-content/uploads/sites/2/2019/09/Agricultural_Conservation_Easements_AFT_FIC_01-2016.pdf. Generally, these easements limit non-farm development, which would ostensibly include the construction of underground pipelines and other uses that are inconsistent with the easement's purposes. *Id.*

The USDA has administered the Agricultural Conservation Easement Program (ACEP) since its establishment in 2014. National Sustainable Agriculture Coalition, *Agri. Conserv. Easement Program* (2019), https://sustainableagriculture.net/publications/grassrootsguide/conservation-environment/agricultural-conservation-easement-program/#basics. ACEP is a combination of three previously separate conservation easement programs: the Wetlands Reserve Program, Grassland Reserve Program, and the Farm and Ranch Lands Protection Program. *Id.* Under the Wetlands Reserve Program, in which the landowners here aimed to participate, the USDA's objective is "to restore, protect, and enhance wetland values and functions on wetlands that have been in agricultural production." *Id.* It is a competitive program, allowing landowners to submit bids to the USDA for enrollment. *Id.* Landowners have the option of granting the USDA two different types of easements: permanent or long-term (usually 30 year) easements. *Id.* For permanent wetland easements, the USDA pays the landowner the lowest of: (1) the fair market value of the land; (2) the value from an area wide market analysis or survey; or (3) an offer made by the landowner. *Id.* For long-term easements, though, the USDA provides between 50%-75% of the compensation that would be paid for a permanent easement. *Id.*

Much of the property here contains wetland-derived soils and is considered eligible for the agricultural easement. *See* ECF 81-22 ¶ 12; ECF 76-1, Ex. A ¶¶ 9-15. As a condition precedent to the USDA's acceptance of the conservation easement, USDA required that a 60-year title examination be

performed. ECF 81-22 ¶ 16. This examination revealed the existence of Trunkline's right-of-way agreements. *Id.*

The landowners attempted to contact Trunkline to clarify the scope of its rights over the property so that it would not conflict with the conservation easement. *See* ECF 81-22 ¶ 17. More details will follow on this front; but, suffice to say now, Trunkline declined to clarify the easement's scope, and the landowners have been unable to consummate the proposed Agricultural Conservation Easement with the USDA. *See, e.g.,* ECF 81-22 ¶ 20. None of the proposed property for the USDA easement falls within the area occupied by Trunkline's current pipelines, nor would it interfere with any of the constructed pipelines that exist. ECF 76-1, Ex. A ¶¶ 29-31. The failure of the parties to agree on Trunkline's easement rights in the two properties led to this dispute.

Because the dispute centers on the grant's express language, and given its relevance to understand the context of communications among the parties, the court provides the language of the Close Armstrong easement in its entirety below (noting that the names change for the Dicksons' agreement but otherwise remain the same):

> KNOW ALL MEN BY THESE PRESENTS: that the undersigned, Leo A. Paull, and Vincent G. Paull, single, and as joint tenants, (hereinafter called GRANTOR, whether one or more), for and in consideration of one dollar in hand paid, receipt of which is hereby acknowledged, and the further consideration of one dollar ($1.00) per linear rod to be paid before the first pipe line is laid, does hereby grant, bargain, sell, convey, and warrant unto TRUNKLINE GAS COMPANY (a Natural Gas Company under the Act of Congress of June 21, 1938, 15 U.S.C.A. 717) a Delaware corporation, its successors and assigns (hereinafter called GRANTEE) a right of way and easement to construct, lay, maintain, operate, alter, repair, remove, change the size of, and replace one or more pipe lines and appurtenances thereto (including without limitation Cathodic Protection equipment) for the transportation of oil, gas, petroleum products or any other liquids, gases or substances which can be transported through pipe lines, the Grantee to have the right to select, change, or alter the routes of such pipe lines under, upon, over, and through lands which the undersigned owns or in which the undersigned has an interest, situated in the County of Starke, State of Indiana, described as follows:
> [location omitted]
> By the terms of this agreement, Grantee is granted the right to lay, construct, maintain, operate, alter, repair, remove, change the size of, and replace at any time or from time to time one or more additional lines of pipe and appurtenances thereto, said

> additional lines not to necessarily parallel any existing line laid under the terms of this agreement. Provided, however, that for each additional line laid after the first line is laid hereunder, Grantee shall pay Grantor, his heirs or assigns, one dollar ($1.00) per lineal rod of additional pipe line laid under, upon, over or through said hereinabove described property.
>
> The Grantee, its successors and assigns, is hereby expressly given and granted the right to assign said right-of-way and easement herein granted and conveyed, or any part thereof, or interest therein. The same shall be divisible among two or more owners as to any right or rights granted hereunder so that each assignee or owner shall have the rights and privileges herein granted, to be owned and enjoyed either in common or in severalty.
>
> TO HAVE AND TO HOLD unto the Grantee, its successors and assigns, with ingress to and egress from the premises for the purposes herein granted.
>
> The said Grantor may fully use and enjoy said premises except for the purposes herein granted to the said Grantee and provided the said Grantor shall not construct or permit to be constructed any house, structures or obstructions on or over or that will interfere with the construction, maintenance or operation of any pipe line or appurtenances constructed hereunder and will not change the grade of such pipe line.
>
> Grantee hereby agrees to bury all pipes to a sufficient depth so as not to interfere with cultivation of the soil and agrees to pay for any damage to growing crops and fences which may arise from the construction, maintenance and operation of said lines. Said damage, if not mutually agreed upon, shall be ascertained and determined by three disinterested persons, one thereof to be appointed by said Grantor, one to be appointed by the Grantee, its successors or assigns, and the third to be chosen by the two persons appointed as aforesaid. The written award of such three persons shall be final and conclusive.
>
> It is mutually understood and agreed that this agreement as written covers all the agreements and stipulations between the parties and that no representations or statements, oral or written, have been made modifying, adding to, or changing the terms hereof.
>
> [other text omitted]

ECF 7, Ex. A.

## PROCEDURAL HISTORY

This consolidated case has a complex procedural history. The first complaint was filed on March 13, 2018 by Close Armstrong in Indiana state court. Trunkline removed the case to this court pursuant to federal diversity jurisdiction. The second complaint was filed in federal court on June 27, 2018 by Plaintiffs Randall and Jaymie Dickson. Due to their similarity in facts and legal issues, the court consolidated both cases on November 8, 2018. ECF 41.

On May 9, 2019, the court (through the Magistrate Judge) conducted a status conference to establish a logical pathway toward resolution of this matter. Due to the nature of the claims presented, the court opted for a bifurcated process—the court would consider a motion for partial summary judgment with respect to the existence of the alleged easement during phase I (legal issues), and then would consider other matters related to the scope of the alleged easement in phase II (equitable issues). Following the conference, the court issued an order (ECF 64) outlining this bifurcated process and directing the parties to file an amended case management plan no later than May 24, 2019.

In response to a request for clarification of the May 10 order, the Magistrate Judge conducted a second telephonic conference on May 21. ECF 65. At this conference, the court was clear about the scope of phase I:  it was limited to the issue of the existence or putative efficacy of the alleged easement. If the court determined that an easement existed as a matter of law, the scope or effect of the easement would be determined in phase II. This division was agreed at least in part because of the parties' discovery needs. Before the May 24 deadline, each party filed its own amended case management plan, which the court crafted into a bifurcated scheduling order. ECF 68.

No party has requested the court to consider issues outside the scope of the Magistrate Judge's system. Accordingly, the court is focused solely on phase I issues—the existence or putative efficacy of the alleged easement. Trunkline filed summary judgment motions on various issues related to this stage of the proceedings against Close Armstrong and the Dicksons respectively. The motions are ripe following oral argument on both motions held October 16, 2019.

## STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could find in its favor to prevent summary judgment. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654

(7th Cir. 2010). The court must deny the motion when there is admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011).

The court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must construe all facts in a light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

This case pends in this court based on diversity jurisdiction. *See* 28 U.S.C. § 1332(a). Under the *Erie* doctrine, federal courts exercising diversity jurisdiction apply the forum state's substantive law and federal procedural law, except when preempted by the Constitution or by an Act of Congress. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 301 (7th Cir. 2010). Substantive laws are those where the law is "motivated by a desire to influence conduct outside the litigation process, such as a desire to deter accidents," while procedural laws are those where the law is "motivated by a desire to reduce the cost or increase the accuracy of the litigation process, regardless of the substantive basis of the particular litigation." *Gacek*, 614 F.3d at 302. "When answering a novel question of state law, we look to 'relevant state precedents, analogous decisions, considered *dicta*, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *In re 180 Equipment, LLC*, 938 F.3d 866, 869-70 (7th Cir. 2019) (quoting *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007)). Thus, the court looks to Indiana substantive law for guidance. *See id.*; *see also West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940).

Federal courts are authorized to render judgments that "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). Such "declaration shall have the force and effect of a final judgment." *Id.* In Indiana, the existence of an easement based on a written grant presents a question of contract interpretation. *Wendy's of Ft. Wayne, Inc. v. Fagan*, 644 N.E.2d 159, 161 (Ind. Ct. App. 1994). "The construction of a written contract is generally a question of law for the court, making summary judgment particularly appropriate in contract disputes." *Whiskey Barrel Planters Co., Inc. v. Am. GardenWorks, Inc.*, 966 N.E.2d 711, 718-19 (Ind. Ct. App. 2012).

DISCUSSION

At this stage of the litigation, the court is presented with three issues. First, the court must determine whether an easement exists as a matter of law. Second, the court must determine whether the language of the right-of-way agreements is ambiguous. Third, the court determines whether these agreements establish the right to "multiple floating easements" as a matter of Indiana law. The court reaches no other issues in this first phase.[2]

A.     *The Right-of-Way Agreements Between Trunkline and Landowners Undisputedly Grants Trunkline Easement Rights in The Two Properties.*

Trunkline seeks summary judgment declaring that enforceable easements exist. ECF 69 at 1; ECF 72 at 1. This issue is rather straightforward. Indiana courts hold that "in construing an alleged

---

[2] The court notes that Trunkline seeks summary judgment in its briefs on the following:

> [1]. The Easement grants Trunkline easement rights with respect to Plaintiff's entire Real Estate, which cannot be restricted to a corridor of a specific width or dimensions;
> [2]. The Easement grants Trunkline the right to lay additional pipelines at any time in the future, which need not be laid parallel to any then-existing pipeline(s), and this right may be exercised under, upon, over and through any portion of the Real Estate; and
> [3]. The Easement grants Trunkline the right to change and alter the course of its existing 100 Line at any time in the future, and this right may be exercised under, upon, over, and through any portion of the Real Estate.

ECF 69 at 2, ¶¶ 2-4; ECF 72 at 2, ¶¶ 2-4. The court has encompassed these requests under the question of whether the right-of-way agreements created multiple floating easements, as argued by Trunkline in its briefs and at oral argument, and except to the extent they invite the court to determine the "scope" of any easement— an issue deferred to phase II.

creation of an easement through grant or reservation, no particular words are necessary; any words which clearly show the intention to give an easement are sufficient." *Tanton v. Grochow*, 707 N.E.2d 1010, 1013 (Ind. Ct. App. 1999). To create a valid easement, the "document must identify with reasonable certainty the easement created and the dominant and servient tenements relative thereto." *Mackiewicz v. Metzger*, 750 N.E.2d 812, 817 (Ind. Ct. App. 2001). Notably, "reasonable certainty" does not require that the easement specify the limitations of the easement's boundaries on the property. *See Town of Ellettsville v. DeSpirito*, 111 N.E.3d 987, 990 (Ind. 2018) (allowing for "floating easements").

Here, there appears to be no dispute among the parties as to whether the easement exists. Indeed, both Close Armstrong and the Dicksons acknowledge in their filings that Trunkline holds *some* type of easement over their properties. *See, e.g.*, ECF 7 ¶ 2; ECF 94 at 1. Additionally, no party disputes the language of the right-of-way agreements within the public record. A plain reading of the agreement with Close Armstrong originally signed in 1959, for instance, expressly states that Trunkline is granted an "easement" in the property. ECF 7, Ex. A, ¶ 1. Although silent as to scope, Indiana law does not require the easement's definition under the circumstances. *DeSpirito*, 111 N.E.3d at 990. Instead, the parties argue over what the language within the agreements means. As a matter of law, the court finds that Trunkline does hold an easement right in the properties.

B.    *For Phase I Purposes, the Right-of-Way Agreements Are Not Ambiguous.*

Once the court determines that there is an easement, "[t]he first hurdle we must pass is determining whether the language of the easement grant is ambiguous." *Drees Co., Inc. v. Thompson*, 868 N.E.2d 32, 39 (Ind. Ct. App. 2007). Determining whether an easement grant is ambiguous is a "pure question of law," which requires the court to construe the terms of the written contract. *Id.* A document is found to be ambiguous "only when reasonable persons find the contract subject to more than one interpretation." *Id.* (citing *Adams v. Reinaker*, 808 N.E.2d 192, 196 (Ind. Ct. App. 2004)).

Unless there is an ambiguity in the deed, the parties' intention must be determined from the language of the deed alone. *Brown v. Penn Cent. Corp.*, 510 N.E.2d 641, 643 (Ind. 1987).

Both sides advocate the plain language of the right-of-way agreements. Together, the landowners alternatively offer several reasons why the identical agreements prepared by Trunkline (*see* ECF 71-1) should be found ambiguous: (1) a reasonable person could be confused as to whether the grant describes the parcel where a pipeline easement may be located or the bounds of the easement; (2) the right of "ingress to and egress from" is inconsistent with an easement to the whole parcel; (3) the words "right-of-way" and "easement" conflict; (4) the forms of consideration[3] in the agreement are inconsistent with purchasing an easement as to all; (5) the Receipt for Right-of-Way's language contradicts the Right of Way Agreement's language; and (6) their rights to fully use and enjoy the property conflicts with Trunkline's claim to an exclusive easement over all the land. After due consideration, the court finds the agreements to be unambiguous for purposes of phase I.

First, the landowners offer no linguistic or evidentiary support for their first point. "Terms of a contract are not ambiguous merely because a controversy exists between the parties concerning the proper interpretation of terms." *Jackson v. State*, 29 N.E.3d 151, 154 (Ind. Ct. App. 2015) (construing the terms of a plea agreement). Furthermore, the court disagrees with their argument here.

Second, the landowners contend that the ingress and egress language suggests that there is land at issue other than that covered by an easement, presupposing then that this cannot be a floating or blanket easement.[4] Effectively the argument is that, if Trunkline has easement rights to the entire properties, it would have no need for ingress and egress rights. But granting a right of "ingress to and egress from" the property is consistent with an easement over the whole parcel when the agreement

---

[3] The agreement provides for $1 paid in hand, further consideration of $1 per rod for the first pipeline laid, and $1 per rod for pipeline laid thereafter.

[4] Floating easement and blanket easement are used synonymously here.

concerns the right to install future pipelines on a property. Notably, other courts faced with the same language of "ingress to and egress from" have not found that these terms conflict with a floating easement over the entire property in the context of a pipeline right-of-way. *See, e.g., Scherger v. N. Nat. Gas Co.*, 575 N.W.2d 578, 579 (Minn. 1998); *Crawford v. Tenn. Gas Transmission Co.*, 250 S.W.2d 237, 238 (Tex. Civ. App. 1952). The argument here seems based on a misunderstanding of the meaning of a floating pipeline easement, which grants the easement holder the ability to lay future pipelines on the property and to have ingress and egress to those pipelines once built. *See Scherger*, 575 N.W.2d at 579. The need for ingress and egress does not go away when there is a right to place an original pipeline anywhere on the property, or to add other pipelines.

Third, Indiana courts have already interpreted other right-of-way agreements to be types of easements, thereby eliminating any ambiguity between the use of the words "easement" and "right of way." *See Richard S. Brunt Tr. v. Plantz*, 458 N.E.2d 251, 252 (Ind. Ct. App. 1983) ("Here, the granting clause clearly and unambiguously conveyed a right of way which Indiana courts have construed to be an easement."). Akin to an easement, a right of way is "a right to cross over the land of another." *Clark v. CSX Transp., Inc.*, 737 N.E.2d 752, 758 (Ind. Ct. App. 2000). Indeed, the instruments here use "right of way and easement" together and interchangeably. These words are not ambiguous, but effectively interchangeable for purposes of these agreements.

Fourth, the court finds no merit in the assertion that the consideration to be paid for the original pipeline or subsequent pipelines conflicts with an easement that covers the entire property. Parties in Indiana enjoy the freedom to contract, *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1129 (Ind. 1995); *Peoples Bank & Tr. Co. v. Price*, 714 N.E.2d 712, 717 (Ind. Ct. App. 1999), so the court presumes that the contracts here reflect their freely bargained agreement, *Weaver v. Am. Oil Co.*, 276 N.E.2d 144, 147 (Ind. 1971). The easement's consideration was acceptable at the time the parties entered into their respective agreements and has remained so for some sixty years. Under the circumstances here, the

court is neither free nor inclined to revise the agreements under the guise that the consideration that might be negotiated today for a floating easement would prove different. *See also Crawford*, 250 S.W.2d at 240 (rejecting same argument).

Fifth, the use of the receipt (reflecting Trunkline's payment) to vary contractual terms contravenes both the agreements and Indiana law. For instance, the right-of-way agreement's merger clause forecloses the argument that the receipt can change the agreements.[5] Merger clauses "express the parties' intention that all prior negotiations, representations, previous communications, and the like are either withdrawn, annulled, or merged into the final written agreement." *Lawlis v. Kightlinger & Gray*, 562 N.E.2d 435, 439 n.1 (Ind. Ct. App. 1990); *see also Whiskey Barrel Planters Co.*, 966 N.E.2d at 719 ("evidence of a prior or contemporaneous statement or negotiation cannot operate either to add to or contradict the terms of the agreement" with merger clause). The court thus would be ignoring the agreements, not faithfully enforcing them, by going beyond this merger clause.

In addition, when a contract is unambiguous, the court "will not consider extrinsic evidence, even if that evidence is another agreement executed on the same day." *Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 756 (Ind. 2018). The purpose of extrinsic evidence is not to create an ambiguity, but to inform one. *See Bar Plan Mut. Ins. Co. v. Likes Law Office, LLC*, 44 N.E.3d 1279, 1285 (Ind. Ct. App. 2015). It would defeat the purpose of *Sawyer* to allow the landowners to reference an extrinsic document—the receipt—to create an ambiguity when the agreements contain no such ambiguity. The court thus finds no ambiguity within the agreements based on this external document.

Sixth, the landowners retained the right to fully use and enjoy their property to be sure, but that right does not conflict with a blanket easement over the entire property. As cogently reasoned at oral argument, the right to full use and enjoyment was retained "except for the purposes" granted

---

[5] Each agreement states: "It is mutually understood and agreed that this agreement as written covers all the agreements and stipulations between the parties and that no representations or statements, oral or written, have been made modifying, adding to, or changing the terms hereof." ECF 81-15, 81-16.

under the easements, thus providing some limitation of that right by the contractual plain language. "The owner of the servient estate may use his property in any manner and for any purpose consistent with the enjoyment of the easement . . . . The owner of the servient estate may not so use his land as to obstruct the easement or interfere with the enjoyment thereof by the owner of the dominant estate." *Panhandle E. Pipe Line Co. v. Tishner*, 699 N.E.2d 731, 739 (Ind. Ct. App. 1998) (distinguishing between property damage within the easement and removing lateral support outside the easement). The agreements expressly contemplated future pipelines, even non-parallel placements, as potential purposes, so it cannot be said either that this creates an ambiguity or that the right of full use and enjoyment goes beyond the plain restrictions on that right by contract.

Thus the landowners retained all rights for use and enjoyment as defined, including activities such as hunting, farming, or preservation, and it would appear rights to build so long as any structure would not interfere with a pipeline "constructed hereunder" these easements. The court need not delve much deeper on this latter issue for phase I. A declaratory judgment action presupposes an actual and justiciable controversy. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126-27 (2007); *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *see also R.R. St. & Co. v. Vulcan Materials Co.*, 569 F.3d 711, 714 (7th Cir. 2009) (declaratory relief is discretionary, not mandatory). Trunkline has conceded it has no current plans to install another pipeline, and the landowners have not come to court because they want to build a home or other structure on the land, so this court need not rule beyond the present controversy.

According to Trunkline, the risk to the landowners for building structures would not be insubstantial under these agreements as written in the event Trunkline exercised its right to build a future pipeline in the same vicinity. One might be bothered by the seeming inequity of this, but an agreement fairly struck is still an agreement to be enforced but for certain circumstances not seemingly present on this record. Rights of use and alienation beyond the conservation program are not before

the court. Merely because the parties (perhaps even the court) may have struck a different bargain does not mean the court can or should rewrite the agreement under the guise of its claimed "ambiguity." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012) ("[W]hen the terms of a contract are drafted in clear and unambiguous language, we will apply the plain and ordinary meaning of that language and enforce the contract according to those terms."); *Fazli*, 650 N.E.2d at 1129 (freedom of contract); *Raymundo v. Hammond Clinic Ass'n*, 449 N.E.2d 276, 279 (Ind. 1983) (best interests of the public not to unnecessarily restrict one's freedom of contract).

Indiana law has addressed this issue before. The servient estate owner (landowners here) "may use [their] property in any manner and for any purpose consistent with the enjoyment of the easement." *Tishner*, 699 N.E.2d at 739. In *Tishner*, the pipeline company placed a pipeline under an easement that permitted one or more lines in parallel and then required maintenance that ultimately damaged the landowner's pool wall, patio, and other improvements. *Id.* at 738. Under the terms of the easement, the pipeline company was obligated to pay only for damage to crops and fences, and the court adhered to that language under Indiana law. *Id.* at 739. The property owners "erected [other] structures at their peril." *Id.* "By the express terms of the easement grant, [the pipeline company] is liable only for damages to crops and fences within its easement caused by its repair or replacement of its pipeline."[6] *Id.*

Other courts echo *Tishner* without finding an ambiguity in the easement. *See Andrews v. Columbia Gas Transmission Corp.*, 544 F.3d 618, 632 (6th Cir. 2008) (under Ohio law, "the agreement provided for damages to crops and fences, not trees" and the "plain and ordinary meaning of these words is clear"); *Yellowstone Pipe Line Co. v. Kuczynski*, 283 F.2d 415, 418 (9th Cir. 1960) (under Idaho law, contract whereby grantee of pipeline easement agreed to pay damages that might arise to crops,

---

[6] *Tishner* recognized that damage caused outside the relevant easement was still compensable. *Tishner*, 699 N.E.2d at 739.

buildings, drain, tile, fences, and timber by reason of its operations did not contemplate payment of damages to land, fish, and access to buildings because "[n]one of the items for which plaintiff is claiming compensation is among those for which defendant agreed, as part of the consideration for the right of way agreement"); *Williams v. N. Nat. Gas Co.*, 136 F. Supp. 514, 519-20 (N.D. Iowa 1955) (under easement providing that pipeline company would pay any damage that might arise to growing crops or fences from construction, maintenance, and operation of its pipeline and damages to premises and to trees, shrubs, and buildings in addition to damage to crops and fences, owner of servient land was not entitled to recover alleged permanent damages to premises resulting from replacement of pipeline in addition to damage to growing crops and timber); *cf. Panhandle E. Pipe Line Co., L.P. v. Pfahl*, 2013 U.S. Dist. LEXIS 105338, 26-27 (C.D. Ill. July 29, 2013) (easement stated that servient owners must be paid for "all damages to crops, fences *or other property* of the grantors on said premises caused by the laying, maintaining, replacing or removing said pipe line"); *Buras v. Shell Oil Co.*, 666 F. Supp. 919, 922-23 (S.D. Miss. 1987) (contract provided language that specified damages to buildings). That the previous landowners who entered into the right-of-way agreements could have explicitly specified damages for certain additional activities or retained other uses of the property doesn't create an ambiguity for purposes of today's opinion.

For purposes of phase I, and based on the arguments advanced by the parties, the court finds no ambiguity in the right-of-way agreements.

C.   *For Phase I Purposes, the Plain Language of the Right-of-Way Agreements Created A Floating Easement on Each Property.*

The last question for this court in this phase is whether the right-of-way rights as granted by the plain language created multiple floating easements. The court decides today that Trunkline received a floating easement on each property by the express terms of the granting instruments.

Indiana law recognizes two types of easements: fixed and floating. *DeSpirito*, 111 N.E.3d at 990. A fixed easement is one where either the instrument creating the right-of-way specifies its location

or one where the law specifies its location based on history, use, or consent. *Id.* In the first instance, the instrument might plainly specify a thirty-foot swath of land for purposes of a driveway, thus fixing the location in that manner. In the latter instance, the law may require that an easement has been fixed by practice. *Id.* An easement fixed by practice lacks a "definite location and description" in the instrument creating it, but it becomes fixed and certain by "the exercise of the easement in a particular course or manner, with the consent of both parties." *Id.* (quoting *Dudgeon v. Bronson*, 64 N.E. 910, 910 (Ind. 1902)); *see also Henning v. Neisz*, 268 N.E.2d 310, 314-16 (Ind. Ct. App. 1971) ("[W]here a right of way is granted, but its locality and duration are not defined, it may become fixed by use and acts of acquiescence of the parties."). For instance, in *Dudgeon*, 64 N.E. at 910, a landowner's use of a sixteen foot right-of-way on the neighbor's land for more than twenty years fixed her easement accordingly such that she could not later change it; and in *Rees v. Panhandle E. Pipe Line Co.*, 452 N.E.2d 405, 410 (Ind. Ct. App. 1983), an easement for four pipelines, otherwise undefined in scope by the granting instrument, was permitted by law to be defined by the trial court as sixty-six foot wide based on the need to maintain visibility and to ensure safety. The question of whether an easement is fixed is a mixed question of law and fact. *DeSpirito*, 111 N.E.3d at 990.

In contrast, a floating easement (also known as a blanket easement) is one that is not limited to any specific part of the servient estate. *Id.* Blanket easements historically have been common tools for utilities, pipelines, railroads, and other infrastructure. These rights-of-way traditionally permit easement holders to place such infrastructure anywhere on the property of concern—a much easier task when constructing a utility line or pipeline designed over great distances. In the United States today, the gas pipeline network is a highly integrated assemblage of some 3 million miles of mainline and other pipelines that link gas production and storage facilities with consumers. *See* U.S. Energy Info. Admin., *Natural Gas Explained: Natural Gas Pipelines* (Dec. 5, 2019), https://www.eia.gov/energyexplained/natural-gas/natural-gas-pipelines.php. These pipelines must have corresponding

rights-of-way, so suffice to say a significant portion of public and private property remains burdened by such easements in this country.

Because of the "floating" nature of blanket easements, conflicts have arisen at times with property owners. Certain states have expressly prohibited blanket easements (*e.g.*, prohibiting blanket easements created after a certain date). *See, e.g.*, Mo. Rev. Stat. §§ 523.010, 523.282; Wy. Stat. Ann. § 34-1-141. Courts generally have continued to enforce floating easements outside of these occasional legislative prohibitions. *See Krenz v. XTO Energy, Inc.*, 890 N.W.2d 222, 233 (N.D. 2017) (law did not authorize a court to invalidate an otherwise binding and voluntary contract though statute was enacted to discourage blanket easements). Indiana has not legislatively proscribed blanket easements, so they remain enforceable under the common law in this state. *DeSpirito*, 111 N.E.3d at 990.

Right-of-way agreements may grant multiple floating easements across a property. *See* Jon W. Bruce & James W. Ely, Jr., *Location and Dimensions of Express Easements—Grants of Multiple Floating Easements*, The Law of Easements & Licenses in Land § 7:8. Such a grant has generally been found sufficiently definite to enforce and has been upheld recognizing the freedom to contract. *N.W. Pipeline Corp. v. Forrest Weaver Farm, Inc.*, 646 P.2d 422, 423 (Idaho 1982) ("The fact that the location of the route for an additional pipeline is not fixed will not render the contract unenforceable."); *Ashcot, Inc. v. Tex. E. Transmission Corp.*, 129 So.2d 405, 408 (Miss. 1961) (same).

A multiple floating easement grant places a greater practical burden on the servient tenement than does a single floating easement. *See* Barbara N. Lawrence, Note, *Real Property: The Effect of Floating Easements Held by Pipeline Companies on Marketability of Title and Land Values*, 37 Okla. L. Rev. 180, 192-93 (1984). As a result, some courts impose reasonableness requirements in locating additional easements on the servient estate. *See Zettlemoyer v. Transcon. Gas Pipeline Corp.*, 657 A.2d 920, 922-26 (Pa. 1995) ("Our holding limits Transco to what is reasonable and necessary to fulfill the purpose of the agreement within the original intent of the parties to the grant."); *Carroll Elec. Co-op. Corp. v. Benson*,

848 S.W.2d 413, 416 (Ark. 1993) (employing reasonableness standard to location of floating electric power line extensions); *cf. Tishner*, 699 N.E.2d at 738 ("easement of indeterminate width is not an easement across the entirety of the [] property, rather, it is only an easement over the area reasonably necessary to carry out the purposes of the easement").[7]

The right decision today rests on what the contract says. After all, this court's duty is to ascertain and give effect to the intention of the parties—determined by a proper construction of the contract's language. *Sawyer*, 93 N.E.3d at 752. Courts must read an easement in its entirety, considering its various parts together so that no part is rejected. *Larry Mayes Sales, Inc. v. HSI, LLC*, 744 N.E.2d 970, 972 (Ind. Ct. App. 2001) (citing *Tazian v. Cline*, 686 N.E.2d 95, 97 (Ind. 1997)). Indiana courts must enforce unambiguous easements as any other contract and decline the invitation of a party to rewrite its plain terms. *B&R Oil Co., Inc. v. Stoler*, 77 N.E.3d 823, 829 (Ind. Ct. App. 2017) ("Nor may a court write a new contract for the parties or supply missing terms."). The court "must interpret the contract as written, not as it might have been written." *Id.*

The right-of-way agreements in this case permit Trunkline to construct, maintain, and replace "one or more" pipelines in the original instance, which the company did through its predecessor in interest. ECF 1, Ex. A. In addition, the agreements grant Trunkline "the right to select, change, or alter the routes of such pipe lines" over and through the properties. *Id.* The agreements also authorize Trunkline to construct, maintain, and replace "one or more additional lines of pipe"—"not to necessarily parallel any existing line." *Id.* By their plain terms, the agreements thus expressly contemplated upon execution that the pipelines and their corridors may not always be "fixed"—either by original location or by ultimate number. *See id.*

---

[7] Indiana has rejected this "reasonableness" approach only for the relocation of fixed easements. *DeSpirito*, 111 N.E.3d at 988 ("We adhere to Indiana's longstanding common-law rule that relocating a fixed easement requires the consent of all affected estate-holders. And we reject the minority approach, reflected in the Third Restatement of Property (Servitudes) which permits the unilateral relocation of easements if a court finds the proposed relocation is 'reasonable.'"). This case does not concern the relocation of a fixed easement.

In the context of floating easements, parties remain free to restrict the easement holder's rights from placing a future pipeline, such as language prohibiting additional pipelines or by expressly providing that additional pipelines must be "alongside [or parallel] . . . [to the] first pipeline," but that wasn't done here. *See* Lawrence, *supra*, at 192-93; *see also Adamson v. Columbia Gas Transmission, LLC*, 987 F. Supp. 2d 700, 702 (E.D. Va. 2013), *aff'd*, 579 Fed. Appx. 175 (4th Cir. 2014) ("the Grantee is further granted the right at any time to lay additional lines of pipe approximately parallel to the first line . . . upon the payment of the price mentioned"); *CCPS Transp., LLC v. Sloan*, 2013 U.S. Dist. LEXIS 105411, 17 (D. Kan. July 29, 2013) ("Here, the parties specifically contemplated that plaintiffs might eventually construct additional pipelines. The Right of Way addresses that right unambiguously. But, by using the terminology 'alongside of said first pipe line,' the contract also contemplates that any subsequent pipelines will be built in a limited area—not wherever plaintiffs please within the forty acres."); *Anderson v. Stokes*, 163 P.3d 1273, 1284 (Mont. 2007) (easement limited to "certain portions" of property by express language of the granting instrument). Such easement agreements of greater limitation have been around for decades, with cases interpreting them to boot. Accordingly, the parties understood how to draft limitations on an otherwise blanket easement if they wanted to do so. Unlike more restrictive floating easements, Trunkline's right-of-way agreements contain no like limitations within their express language.

That is not to say that the right granted to Trunkline on each property cannot become fixed— a question of scope that the court and parties have reserved for phase II of this case.[8] *DeSpirito*, 111 N.E.3d at 990; *Tishner*, 699 N.E.2d at 734-35; *Rees*, 452 N.E.2d at 410. To that point, in the same manner that the plain language of these agreements guides the court in viewing the 1959 grants as

---

[8] At times, the parties seem to recognize that the question of whether the easement has been fixed by practice is premature—Trunkline arguing at one point that this is an issue for phase II (Tr. 37), Close Armstrong agreeing that the court lacks a full record to make this determination now (Tr. 48), and the Dicksons pointing out the interpretation of the right-of-way as a single easement begs for its defined scope in phase II (Tr. 57).

floating, the plain language also gave to Trunkline but *one easement*. The instruments granted Trunkline "a right of way and easement." ECF 1, Ex. A. The instruments also authorized Trunkline to assign "said right of way and easement." *Id.* The language is singular, not plural. To the extent that Trunkline argues and seeks summary judgment that it enjoys "multiple floating easements" or the right to such (*see, e.g.*, ECF 95 at 2-3; Tr. at 9), the court rejects that view likewise under the plain language of these right-of-way agreements.

Even a multiple pipeline grant can be construed by law to require the placement of those pipelines—parallel or not—within one defined easement. *See, e.g., Tishner*, 699 N.E.2d at 734-35 (allowing construction of a second pipeline); *Rees*, 452 N.E.2d at 410 (four pipelines); *Coughlin v. Anderson*, 853 A.2d 460, 474 (Conn. 2004) (even if utility company "preserve[d] not only the three existing [utility] conduits over the property, but also the right to install additional conduits in the future, the fact that the easement had been exercised previously through the installation of three conduits now circumscribes the potential future conduits to the same general geographic location as the three existing conduits"); *Bradley v. Ark. La. Gas Co.*, 659 S.W.2d 180, 181-82 (Ark. 1983) ("We know of no reason why more than one pipeline cannot be placed within one right of way."); *see also Kleinheider v. Phillips Pipe Line Co.*, 528 F.2d 837, 842 and n.4 (8th Cir. 1975) (pipeline company had right to install additional pipelines, and had installed three, though counsel recognized "in accordance with the prevailing law, that the original pipeline set the course of its petroleum transmission system"). That Trunkline procured the contractual right to install additional pipelines across these two properties does not mean it has multiple floating easement rights—not under this grant's plain language.

The present controversy thus revolves around Trunkline's claim that they hold the right to install multiple pipeline corridors over the entirety of the landowners' properties, which now inhibits the landowners from entering their land into government conservation easements. Regrettably, the case law in Indiana on whether an easement is fixed or floating, or how a floating easement becomes

fixed, remains sparse. In fact, the court can only find two cases where Indiana courts have used the phrase "floating easement" or "blanket easement." *DeSpirito*, 111 N.E.3d at 990; *Lake Erie & W.R. Co. v. Ziebarth*, 33 N.E. 256, 258 (Ind. Ct. App. 1893); *cf. Burrow v. Terre Haute & Logansport R.R. Co.*, 8 N.E. 167, 169 (Ind. 1886). Trunkline has cited no Indiana cases where a floating easement was permitted to remain floating. Still, these cases and others in Indiana stand in line with the court's interpretation of the plain language of the right-of-way agreements for phase I.

In *Burrow*, 8 N.E. at 168, a landowner granted an easement to a railroad company for the purpose of building a railroad. The instrument for the right-of-way specified a ninety-nine foot wide easement, with the center line to be the center of the railroad track, but otherwise permitted the railroad company to select the location for the line on the property. *Id.* Although the terms "floating" or "blanket" easement never appear in the opinion, the easement was undoubtedly one as it was not limited to any specific part of the servient estate. *See DeSpirito*, 111 N.E.3d at 990. Contrary to the arguments advanced by the landowners here, the railroad company held a vested interest in the land for railroad purposes, though not yet exercised. *Burrow*, 8 N.E. at 170; *see also Wedel v. Am. Elec. Power Serv. Corp.*, 681 N.E.2d 1122, 1132 (Ind. Ct. App. 1997) (a "vested" property right includes one either vested in interest or possession). Contrary to Trunkline's argument about future rights, while it must not be overlooked that *Burrow* concerned a single easement for the purpose of a single railway, the Indiana Supreme Court also viewed the grant as a "conditional one"—"liable to be defeated by the failure to use the land for the purpose for which it was granted." *Burrow*, 8 N.E. at 170. What is more, the state's highest court held that, because "[i]t cannot be known in advance where the railway will be located," "such contracts as the present must be understood as vesting in the railway company a right to select a location," albeit "within fair and reasonable restrictions." *Id.* at 169; *see also id.* at 169-70 (construing contract to permit any act within the grant "reasonably necessary to enjoy the easement

granted"). Indiana law thus imposed fair and reasonable restrictions on an otherwise open-ended or blanket right to establish a future railroad corridor.

The modern bookend to this history of fixed and floating easements is *DeSpirito*. This case dealt with a utility easement that traversed two lots once they were subdivided. *DeSpirito*, 111 N.E.3d at 990. The *DeSpirito* court did not rely on any express easement grant language in analyzing the rights of the parties. Instead, the court relied on a recorded subdivision plat that delineated the easement with a dotted line. *Id.* One landowner wanted to move the utility easement to increase the building space for a convenience store and argued that the easement was not "fixed," stating that "the plat describes only the easement's width, not its location in relation to the lot's boundaries." *Id.* The Indiana Supreme Court disagreed, finding the easement's measurements were determinable from the subdivision plat's scaling. *Id.* at 991.

Significantly, the court continued on to address whether the easement was also fixed by practice. The court stated that "even if the plat were not drawn to scale, the disputed easement is fixed by practice." *Id.* The court observed that when "the right to an easement is granted without giving definite location and description to it, the exercise of the easement in a particular course or manner, with the consent of both parties, renders it fixed and certain." *Id.* (quoting *Dudgeon*, 64 N.E. at 910). While the court never explains precisely how the utility easement was so fixed, at oral argument for this case, the parties suggested that *DeSpirito* looked to the history of use of the easement in determining that it was fixed by practice. *DeSpirito* thus provides guidance on Indiana law in this area, perhaps too for phase II, but not specific to the language of the right-of-way agreements for phase I.

Between these two Indiana Supreme Court cases sits *Ziebarth* (floating easement) and *Tishner* (floating easement turned fixed easement)—decisions from the Indiana Court of Appeals. In *Ziebarth*, 33 N.E. at 257-58, a railroad company procured a floating easement to locate and construct a railroad over 80 acres of property called the Heise land in 1870. Once placed, the easement by grant would be

100 foot wide. *Id.* at 258. The grant included the right to use materials from this strip of land to build the railroad. *Id.* at 259. The railroad was projected to run from Muncie, Indiana to the Illinois border. *Id.* at 257. Instead of placing the railroad on the Heise land, the railroad company constructed its railroad on other property to the north. *Id.* at 257-58. When the town of Boylston developed on the Heise land, and business increased in 1889, the railroad expanded its operations with a switch, using soil from the Heise land to do so. *Id.*

The court held that the floating easement over the Heise land "would only be rendered effectual, and made to operate as a conveyance of title to any part, by the actual location of the route of the [rail]road across the tract of land described, which location would for the first time render the deed applicable to a specific piece of the land." *Id.* at 258. Based on the facts, the court held that the railroad company had abandoned its intent to place a railroad over the land after 19 years of non-use and given the railroad's location elsewhere, so it was estopped to assert an easement in the Heise land. *Id.* A jury verdict for damages to the property was thus affirmed. *Id.* Again, this case concerned a single line within a single easement, not the right to multiple lines, but it recognizes the existence and enforceability of floating easements in Indiana, assuming they are exercised.

In *Tishner*, 699 N.E.2d at 734, the Indiana Court of Appeals provided additional guidance on how easements otherwise floating can be "fixed by practice" in interpreting a pipeline right-of-way agreement similar, though not the same, to those here. A gas company had "the right to lay, maintain, operate, repair, replace, change the size of, and remove a pipeline." *Id.* The agreement also provided that the gas company could at any time in the future lay a "second line of pipe alongside of the first line." ECF 76-1, Ex. M, at 136; Tr. 27-28. Trunkline conceded at oral argument that this grant was of a floating easement, and was right to do so. Tr. 29. At the time of the dispute, the gas company had laid only one pipeline. *Tishner*, 699 N.E.2d at 734. The company needed to do work on the pipeline, including removing a brick wall and various other trees and shrubs on the property. *Id.* at 735.

Following the removal of those trees and wall, the landowner attempted to replant and rebuild those items. *Id.* The gas company filed for a temporary restraining order to prevent such development, saying that the development interfered with its easement rights to maintain the pipeline. *Id.*

In assessing the rights of the parties, *Tishner* noted that an "easement of indeterminate width is not an easement across the entirety of [the landowner's] property, rather, it is only an easement over the area reasonably necessary to carry out the purposes of the easement." *Id.* The court further noted that "[a] trial court may determine the extent of an easement of undefined width." *Id.* At trial, the gas company had introduced evidence that sixty-six feet was all the company needed for the purposes of maintaining and repairing the one pipeline. *Id.* The court thus affirmed the trial court's determination that the easement was only sixty-six feet in width. *Id.*; *see also Rees*, 452 N.E.2d at 410.

A cursory consideration of *Tishner*'s language might suggest its application now, but it really speaks to phase II of this case. *Tishner* speaks not to the scope of contractual rights under the plain terms of the right-of-way agreements, but instead helps define the scope of an easement created by the placement of a pipeline. One is a pure question of contract; the other is a mixed question of law and fact once a contract right has been exercised. *Tishner* may mandate that a trial court reasonably limit the scope of an easement right once a pipeline corridor has been selected and used, but that is not the issue at this stage.

Key distinctions in *Tishner* guide the court in adhering to its interpretation of the plain language of the right-of-way agreements. First, the *Tishner* grant remained limited to one or two pipelines (ECF 76-1, Ex. M, at 136), whereas the granting instrument here afforded Trunkline the right to construct "one or more additional lines of pipe," without any apparent limitation on their number. Second, and perhaps more to the point, *Tishner* confined the second pipeline to an area "alongside" the original line (ECF 76-1, Ex. M, at 136), whereas Trunkline could construct its additional pipelines in a location "not [] necessarily parallel" to the other pipeline, and could even move its original pipeline. *Tishner*

thus arguably had more restriction against a floating easement, and a restriction that has been recognized as such in other cases. Third, as a matter of substance, *Tishner* dealt with the scope of the easement necessary to maintain the gas company's pipeline already in the ground—a phase II issue in this case—but not the company's right in the future to lay an additional pipeline—the issue that the court must decide under the governing agreements today. *See also Rees*, 452 N.E.2d at 410 (dealing with scope of easement, but not interpretation of contractual rights); *Jeffers v. Toschlog*, 383 N.E.2d 457, 459-60 (Ind. Ct. App. 1978) (deciding scope of easement, not right to future rights-of-way under a contract); *Henning*, 268 N.E.2d at 314-16 (same); *Vanatta v. Waterhouse*, 71 N.E.159, 160-61 (Ind. Ct. App. 1904) (same); *cf. Mielke v. Yellowstone Pipeline Co.*, 870 P.2d 1005, 1005 (Wash. Ct. App. 1994) (requiring gas company to replace its pipeline within scope of easement established by the original pipeline because the parties crossed out language permitting additional pipelines).

In short, the court must enforce the right-of-way agreements according to their plain terms, absent any equitable arguments that might be raised in phase II. *Sawyer*, 93 N.E.3d at 752; *Fazli*, 650 N.E.2d at 1129. Whether the conservation program may in the minds of the landowners, public, or perhaps even the court prove to be a better use of the land is not the question. "Property rights in Indiana are not so flimsy that they may be modified or eliminated if their exercise impedes what is thought to be a more productive or worthwhile use of land." *DeSpirito*, 111 N.E.3d at 988.

The court reaches its conclusion under Indiana law and the plain language of the granting instruments. Despite the issue's novelty to this state, other courts—including in the Gulf states where such issues might reach the courts more readily—have reached the same conclusion under similar easements. In *Ashcot, Inc. v. Tex. E. Transmission Corp.*, 129 So.2d 405, 405-06 (Miss. 1961), the easement, like the one here, existed by way of a contract that granted the pipeline company the right to lay "one or more additional lines of pipe" for a specified amount of consideration. The agreement did not require that the additional line be parallel to an existing line and allowed for additional lines to

be laid "under, upon, over or through said hereinbefore described property." *Id.* at 406. Analyzing the rights of the parties under this grant, the Mississippi Supreme Court stated as follows:

> Right-of-way instruments, with substantially the same provisions as the one for consideration by the Court in this instance, have been construed by courts in other jurisdictions. With one accord, they have held that such instruments were not vague and indefinite; and that the grantees therein had the right, under such agreements, to lay and construct additional pipelines.

*Id.* at 407. *Ashcot* rejected claims, similar to those advanced by the landowners here, that the gas company's easement should be confined to a particular portion of the property, finding instead that the gas company could place its future pipelines on any portion of the property. *Id.*

The Fifth Circuit Court of Appeals adhered to this same result finding a blanket easement for multiple pipelines over the property's entirety in a *per curiam* opinion. *Aaron v. Fla. Gas Transmission Co.*, 412 F.2d 802, 802 (5th Cir. 1969) (interpreting Mississippi law). The Fifth Circuit held that an "easement unambiguously granted the appellee the right to construct an additional pipeline on a nonparallel course across the landowner's property and outside the original right-of-way." *Id.*; *accord Baker v. Columbia Gulf Transmission Co.*, 218 So.2d 39 (Miss. 1969); *Hamilton v. Transcon. Gas Pipe Line Corp.*, 110 So.2d 612, 613-14 (Miss. 1959) (affirming injunction against objectors to pipeline company's construction because it was authorized to lay an original line and to install additional pipelines).

Likewise, in *Crawford v. Tenn. Gas Transmission Co.*, 250 S.W.2d 237, 239 (Tex. Civ. App. 1952), the court analyzed whether a pipeline company had the authority under an agreement to construct additional pipelines. Relying on an easement agreement that arguably was even less broad than the one at issue here (limiting additional pipelines to area "adjacent to and parallel with the first pipe line," *id.* at 238), the court determined that "any attempt by the courts to limit the appellee to a certain portion of the land would alter the stated purpose for which the grant was made." *Id.* at 241.

The results in the Midwest (and other parts of the country) have not varied from the Gulf states when a right-of-way instrument expressly provides for additional pipelines across the property.

In *Scherger v. N. Nat. Gas Co.*, 575 N.W.2d 578, 581 (Minn. 1998), a gas company had the right to construct multiple pipelines within an easement grant. The Minnesota Supreme Court found that "[t]his language, without question, contemplates that in the future additional and/or replacement pipelines could be constructed" and that there was "nothing in the easement agreement which limits or restricts in any way the location within the easement of any additional or replacement pipelines." *Id.* at 581. Relying on that rationale, the court found that the gas company held a blanket easement over the entirety of the property owner's land. *Id.*

Thus, while interpreting the granting instruments under Indiana law, the court's decision today stands in line with the "one accord" observed in *Ashcot. See also Great Lakes Gas Transmission Co v. MacDonald*, 485 N.W.2d 129, 131 (Mich. Ct. App. 1992) ("agreement very clearly gives [company] the right to construct more than one pipe line"); *N. Nat. Gas Co. v. Knop*, 524 N.W.2d 668, 671 (Iowa Ct. App. 1994) ("On the contrary, the possibility of future construction is consistent with the 'when and as' language as well as the use of the plural 'pipelines.' We conclude the easements permit the construction of Northern's proposed pipeline additions."); *Forrest Weaver Farm, Inc.*, 646 P.2d at 423-25 (upholding blanket easement); *Sorrell v. Tenn. Gas Transmission Co.*, 314 S.W.2d 193, 195 (Ky. Ct. App. 1958) (denying arguments that an easement agreement allowing for the future construction of additional pipelines was vague, uncertain, or indefinite so as to invalidate the agreement, and permitting the construction of future pipelines); *Baker v. Tenn. Gas Transmission Co.*, 250 S.W.2d 566, 569 (Tenn. 1952) ("That language is capable, in the opinion of this Court, of but one construction. That construction is that it grants to the gas company an easement under which the servitude may subsequently be expanded. . . . Therefore, the gas company was authorized by the deed of the Bakers to construct this second line.").

The landowners point to several cases in apparent contrast. *See Enbridge Energy, Ltd. P'ship v. Engelking*, 2016 Wisc. App. LEXIS 692, 6 (Wis. Ct. App. Oct. 25, 2016); *Anderson*, 163 P.3d at 1277;

*Coughlin*, 853 A.2d at 464; *Bradley*, 659 S.W.2d at 181; *Scott v. Columbia Gulf Transmission Co.*, 405 S.W.2d 784, 789 (Tenn. Ct. App. 1965); *Winslow v. City of Vallejo*, 84 P. 191, 192 (Cal. 1906). Each case, though, is either distinguishable from this case or deals with an issue properly reserved for phase II. For instance, two cases involve agreements that did not contain rights to install future pipelines. *See Bradley*, 659 S.W.2d at 181; *Winslow*, 84 P. at 192-93. Another case dealt with the limited contractual right to install future radio towers at "select . . . places" on "certain portions" of the property, without the ability to change their location as conferred by these right-of-way agreements, thus convincing this court that it need not follow that decision here. *Anderson*, 163 P.3d at 1276-77. Yet another, *Scott*, 405 S.W.2d at 789-90, concerned damages caused during pipeline construction, but not an enforceability analysis facing this court in this phase; moreover, much of the court's analysis there involved issues properly reserved to phase II. The court will also not follow an unpublished opinion having no precedential value in its home state, particularly when the easement grant there is not the same as the court must interpret here. *Engelking*, 2016 Wisc. App. LEXIS 692 at 22. The court distinguishes these cases solely for the purpose of interpreting the plain language of the right-of-way agreements in this case, without reaching whether they have any bearing on phase II.

"Courts do not have the power . . . to insert language into a contract which was not inserted by the parties, and [courts] will not undertake to rewrite the parties' contract." *Gen. Motors Corp. v. Northrop Corp.*, 685 N.E.2d 127, 135 (Ind. Ct. App. 1997) (citation omitted). Based on the plain language of Trunkline's agreements with these landowners, it contracted for a floating easement over each property. While this may seem an unforgiving result, Indiana courts are unwilling to release a servient estate owner from an agreement freely entered just because it turns out to be a bad bargain sixty years later or because there seems to be a better use of the land. *See DeSpirito*, 111 N.E.3d at 988; *Gen. Motors*, 685 N.E.2d at 135 (Indiana courts "do not have the power to create for the parties a contract which they did not make"); *see also Haegert*, 977 N.E.2d at 937.

This court likewise adheres to the granting instruments that exist in this case. The right-of-way agreements granted a floating easement over each property to Trunkline and gave Trunkline the right to lay additional pipelines that need not be parallel to the existing pipeline and the right to alter the course of its existing 100 Line. However, the right-of-way agreements granted only a single easement over each property, not multiple floating easements. Summary judgment for Trunkline is thus appropriate only in these respects in phase I.

The question of whether an easement is fixed is a mixed question of law and fact. *DeSpirito*, 111 N.E.3d at 990. The court has decided today that Trunkline received a floating easement on each property by the express terms of the granting instruments. Whether as a matter of fact or equity, or perhaps some other doctrine, the respective easement on each property has become thereafter fixed will await a full record in phase II.

> D. *For Purposes of Phase I, The Requests to Strike are Moot.*

Trunkline argues that many of the Dicksons' and Close Armstrong's affirmative defenses should be stricken from their answers to Trunkline's counterclaim. Yet striking these affirmative defenses would have no bearing on today's ruling. The arguments also exceed the permitted scope of phase I. The court denies these motions to strike contained within Trunkline's motions for summary judgment as moot for purposes of phase I.

The landowners submitted numerous exhibits showing different types of conduct following the creation of the easements that, they claim, show a practice that confined Trunkline's easement rights to a portion of the property. Trunkline has moved to strike most of these exhibits, arguing that they are inadmissible as evidence at this summary judgment stage.[9]

---

[9] The court alerts the parties that future exhibits filed in this case should be uploaded as separate exhibits in the ECF system as opposed to one single document that contains all the exhibits. For instance, Exhibit 2 to ECF 76 would be ECF 76-2. Doing so enables the court more efficiently to track and review exhibits and arguments relating to the admissibility of evidence. To the extent the parties can also be mindful of not having seemingly duplicate exhibits when in actuality they are not (*e.g.*, Exhibit B to another Exhibit B), that would prove helpful.

The court has the power to strike material in a summary judgment motion if necessary "to tame . . . tempestuous litigation." *See Phillips v. Mabus*, 319 F.R.D. 36, 38 (D.D.C. 2016) (citation omitted); *see also Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989) (motions to strike are generally disfavored but may be used to expedite a case by "remov[ing] unnecessary clutter"). Under Fed. R. Civ. P. 56(c)(2), a party may object to summary judgment evidence that cannot be presented in a form that would be admissible at trial. Although under the advisory committee notes to this rule, "[t]here is no need to make a separate motion to strike" when objecting to Rule 56 evidence, Fed. R. Civ. P. 56 advis. comm. n. 2010, this court's local rules recommend a separate motion, though not one that takes a "kitchen sink" approach as these do. *See* N.D. Ind. L.R. 56-1(e). Such motions to strike only delay ruling.

The exhibits by way of proposed parole evidence have no bearing on this phase I ruling, so the motions are moot. The court remained within the four corners of the granting instruments to decide phase I issues. This evidence might or might not prove relevant in assessing the scope of the easement on each property. The court need not decide that today. Accordingly, the court denies Trunkline's motions to strike the exhibits (ECF 97; ECF 101) as moot.

CONCLUSION

The court declares the right-of-way agreements unambiguous for purposes of phase I. By their plain terms, the right-of-way agreements granted a floating easement over each property at issue to Trunkline, but not multiple floating easements. Under their plain language, Trunkline has the right to lay additional pipelines that need not be parallel to the existing pipeline and the right to alter the course of its existing 100 Line. The court accordingly GRANTS IN PART summary judgment for Trunkline, but only in this manner for phase I. Whether the easement on each property has become subject to an equitable limitation or fixed by selection, use, or consent under Indiana law, and what the scope of the one easement ultimately will be under this mixed question of law and fact, such issues are reserved

for phase II. The court DENIES AS MOOT Trunkline's motions to strike affirmative defenses and exhibits for purposes of phase I.

SO ORDERED.

January 21, 2020

_s/ Damon R. Leichty_
Judge, United States District Court