UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CLOSE ARMSTRONG, LLC,

Plaintiff,

v.                                                          CAUSE NO. 3:18cv270 DRL-MGG

TRUNKLINE GAS COMPANY, LLC,

Defendant.
                                                           Consolidated with

RANDALL L. DICKSON and
JAYMIE L. DICKSON,

Plaintiffs,

v.                                                          CAUSE NO. 3:18cv494 DRL-MGG

TRUNKLINE GAS COMPANY, LLC,

Defendant.

OPINION AND ORDER

In 1959, Trunkline Gas Company, LLC acquired easement rights through hundreds of properties

in northwest Indiana to install underground pipelines, including one that runs from the Gulf of Mexico

to the Michigan border now called the 100 Line. Not knowing the exact trajectory of this interstate natural

gas pipeline, Trunkline acquired what the law calls floating (or blanket) easements to permit the company

to select a pathway, to move that line in the future as necessary, and ultimately to install additional

pipelines elsewhere on the properties.

The 100 Line has existed since 1960. Two property owners—Randall and Jaymie Dickson and

Close Armstrong, LLC—thereafter developed plans to place their land within the Agricultural

Conservation Easement Program sponsored by the United States Department of Agriculture. Trunkline's

easement rights interfered with this plan, so the landowners sued to fix to a precise location not just

Trunkline's 100 Line but also its future rights to install additional pipelines or to move a pipeline. Today

the court grants summary judgment for Trunkline, save for reserving for trial the singular question of the precise definition of the corridor for the 100 Line, as fixed by use.

## BACKGROUND

Trunkline acquired its easement rights in 1959 by express grants. Predecessors in interest to both the Dicksons and Close Armstrong entered into the same right-of-way agreements with Trunkline in 1959 (only the names change):

> KNOW ALL MEN BY THESE PRESENTS: that the undersigned, Leo A. Paull, and Vincent G. Paull, single, and as joint tenants, (hereinafter called GRANTOR, whether one or more), for and in consideration of one dollar in hand paid, receipt of which is hereby acknowledged, and the further consideration of one dollar ($1.00) per linear rod to be paid before the first pipe line is laid, does hereby grant, bargain, sell, convey, and warrant unto TRUNKLINE GAS COMPANY (a Natural Gas Company under the Act of Congress of June 21, 1938, 15 U.S.C.A. 717) a Delaware corporation, its successors and assigns (hereinafter called GRANTEE) a right of way and easement to construct, lay, maintain, operate, alter, repair, remove, change the size of, and replace one or more pipe lines and appurtenances thereto (including without limitation Cathodic Protection equipment) for the transportation of oil, gas, petroleum products or any other liquids, gases or substances which can be transported through pipe lines, the Grantee to have the right to select, change, or alter the routes of such pipe lines under, upon, over, and through lands which the undersigned owns or in which the undersigned has an interest, situated in the County of Starke, State of Indiana, described as follows:
>
> [location omitted]
>
> By the terms of this agreement, Grantee is granted the right to lay, construct, maintain, operate, alter, repair, remove, change the size of, and replace at any time or from time to time one or more additional lines of pipe and appurtenances thereto, said additional lines not to necessarily parallel any existing line laid under the terms of this agreement. Provided, however, that for each additional line laid after the first line is laid hereunder, Grantee shall pay Grantor, his heirs or assigns, one dollar ($1.00) per lineal rod of additional pipe line laid under, upon, over or through said hereinabove described property.
>
> The Grantee, its successors and assigns, is hereby expressly given and granted the right to assign said right-of-way and easement herein granted and conveyed, or any part thereof, or interest therein. The same shall be divisible among two or more owners as to any right or rights granted hereunder so that each assignee or owner shall have the rights and privileges herein granted, to be owned and enjoyed either in common or in severalty.
>
> TO HAVE AND TO HOLD unto the Grantee, its successors and assigns, with ingress to and egress from the premises for the purposes herein granted.
>
> The said Grantor may fully use and enjoy said premises except for the purposes herein granted to the said Grantee and provided the said Grantor shall not construct or permit to be constructed any house, structures or obstructions on or over or that will interfere with the construction, maintenance or operation of any pipe line or appurtenances constructed hereunder and will not change the grade of such pipe line.

> Grantee hereby agrees to bury all pipes to a sufficient depth so as not to interfere with cultivation of the soil and agrees to pay for any damage to growing crops and fences which may arise from the construction, maintenance and operation of said lines. Said damage, if not mutually agreed upon, shall be ascertained and determined by three disinterested persons, one thereof to be appointed by said Grantor, one to be appointed by the Grantee, its successors or assigns, and the third to be chosen by the two persons appointed as aforesaid. The written award of such three persons shall be final and conclusive.
>
> It is mutually understood and agreed that this agreement as written covers all the agreements and stipulations between the parties and that no representations or statements, oral or written, have been made modifying, adding to, or changing the terms hereof.
>
> [other text omitted]

The parties recorded the agreements in the Starke County Recorder's Office. In 1960, Trunkline began installing its 100 Line—a 26-inch-high pressure natural gas pipeline that traverses both properties.

Shortly thereafter, Close Armstrong's predecessors in interest, Vincent and Leo Paull, signed a "stump agreement" that allowed Trunkline to bury stumps "beyond the limits of the sixty-six (66) foot right-of-way."[1] After the 100 Line's installation, it seems Trunkline cleared and largely maintained a corridor of 66 feet in width around it for inspection and maintenance. Trunkline conducted at least monthly aerial surveillance along the 100 Line. Trunkline has no recorded physical presence on the properties outside of the 66-foot corridor since the 100 Line's installation.

Close Armstrong's most recent predecessor in interest, Glenda Marshall, planted hundreds of trees on her property throughout the 1980s, 1990s, and 2000s near, and at times within the corridor Trunkline used to maintain the 100 Line. Ms. Marshall communicated with Trunkline representatives about the pipeline corridor and the company's need to clear trees. She was protective of her property and the trees she planted, and she resisted their removal for pipeline maintenance. At one point, she communicated that Trunkline representatives may no longer cross her land to get to the 100 Line.

[1] The parties dispute the landowners' ability to authenticate and render admissible some of the evidence demonstrating Trunkline's conduct after entering into the right-of-way agreements. *See Vidhi, LLC v. Arch Specialty Ins. Co.*, 2023 U.S. Dist. LEXIS 43443, 7-8 (N.D. Ind. Mar. 15, 2023) (stating standard). Because these facts don't change the result today, and are better suited for trial, the court offers them for context for the arguments to come.

During the late 1990s, a Trunkline representative noted trees within the "right-of-way" that needed to be cleared. He communicated the company's plan to Ms. Marshall: "This right of way agreement is defined as an open easement with additional pipeline rights. Trunkline [G]as Company limits construction to and maintains a right of way of 66 feet in width, 33 feet on both sides of the pipeline, when an open easement is involved. This footage has been established and is considered sufficient to maintain the required maintenance work on our pipeline." In a subsequent letter, the same representative reported similarly: "Normally, when we have an open easement such as the easement on your property, we maintain 33 feet on both sides of the pipeline. . . . [I]t was determined that there are four, 4" diameter trees within the 20 foot section to the north that we need to take out." During this series of correspondence, Ms. Marshall's attorney wrote to Trunkline and said, "the Marshalls believe it is necessary for Trunkline and them to agree [] at this time to the extent of any easement on the property."

Chet Marshall, Glenda Marshall's son, obtained the property through a trust and thereafter deeded the land to Close Armstrong (a two-member company with Chet Marshall as one member) after its formation in January 2017. The Dicksons purchased their property in 2013 with the intent to create a conservation habitat. Both landowners today want to grant an Agricultural Conservation Easement to the United States Department of Agriculture (USDA).[2] As a condition to the USDA's approval, the USDA required a 60-year title examination. The title work revealed the existence of Trunkline's right-of-way agreements establishing floating easements on both properties. The USDA would not accept the properties into the conservation program with these easement rights.

---

[2] A conservation easement is a "deed restriction landowners voluntarily place on their property to protect resources such as productive agricultural land, ground and surface water, habitat, historic sites or scenic views." *Close Armstrong, LLC v. Trunkline Gas Co., LLC*, 434 F. Supp.3d 658, 664 (N.D. Ind. 2020). "Generally, these easements limit non-farm development, which would ostensibly include the construction of underground pipelines and other uses that are inconsistent with the easement's purposes." *Id.*

Both properties contain acres of wetland with large amounts of surface water. Weather and wildlife affect the surface water levels on the properties. In 2014 and 2015, the landowners attempted to influence the amount of surface water by installing a "leveler," which allowed water to flow through beaver-created dams on their properties. The landowners argue this reduced the surface water on the property, whereas Trunkline argues it encouraged the impoundment of water. Without yet a seeming hazard to its 100 Line for present purposes (though perhaps added access complications), Trunkline continued to maintain its pipeline corridor without putting to use its other rights under the right-of-way agreements.

The Dicksons and Close Armstrong contacted Trunkline to clarify the scope of its easement rights over their properties so as to not conflict with the proposed conservation easement. Trunkline declined to clarify the easement's scope, and the landowners were unable to consummate the conservation easement with the USDA. The inability of the parties to agree on Trunkline's easement rights on the two properties led to this suit to have the court declare their respective rights. Trunkline has the same or similar right-of-way agreements with other property owners in northern Indiana. As evidence that Trunkline has fixed or acquiesced to a certain defined use, the Dicksons and Close Armstrong point to Trunkline's conduct with these other property owners, which at times has involved similar maintenance work, stump agreements, and amendments to and releases of separate right-of-way grants.

Close Armstrong sued first on March 13, 2018. Trunkline removed the case here. The Dicksons then sued directly in federal court on June 27, 2018. Due to the similarity in facts and legal issues, the court consolidated both cases on November 8, 2018. The magistrate judge bifurcated the case to address the easement's existence first and then to address the scope of the easement.

In the first phase, after discovery, the court found the right-of-way agreements unambiguous in granting to Trunkline one floating easement over each property. "The right-of-way agreements granted a floating easement over each property to Trunkline and gave Trunkline the right to lay additional

pipelines that need not be parallel to the existing pipeline and the right to alter the course of its existing 100 Line." *Close Armstrong, LLC v. Trunkline Gas Co., LLC*, 434 F. Supp.3d 658, 681-82 (N.D. Ind. 2020). Noting that whether an easement has become fixed is a mixed question of law and fact, the court recognized Trunkline's floating easement on each property by the express terms of the granting instruments and reserved to this second phase whether the easement "has become subject to an equitable limitation or fixed by selection, use, or consent under Indiana law, and what the scope of the one easement ultimately will be." *Id.* at 683. Today, after more discovery, summary judgment motions, and oral argument held on January 31, 2023, the court addresses these questions.[3]

## STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could find in its favor to prevent summary judgment. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The court must deny the motion when there is admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011).

The court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must construe all facts in a light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

---

[3] The court commends these parties and their counsel for the quality of their briefing, submissions, and advocacy, which have greatly aided the court in its review and deliberation.

Federal courts are authorized to render judgments that "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). Such "declaration shall have the force and effect of a final judgment." *Id.* Indiana supplies the substantive law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 301 (7th Cir. 2010). "When answering a novel question of state law, [the court] look[s] to relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *In re I80 Equip., LLC*, 938 F.3d 866, 869-70 (7th Cir. 2019) (quotations omitted).

DISCUSSION

The court reserved for this phase the question of whether the floating easement on each property has become equitably fixed—whether by selection, use, acquiescence, consent, or some other doctrine under Indiana law—and then, if so, its precise scope. Both property owners argue that the easement, otherwise a floating easement, has since their grant become fixed to a location surrounding the only pipeline (the 100 Line) that Trunkline today maintains.[4]

The parties draw different lines. Trunkline argues that the right-of-way agreements prove quite clear in extending to the company an easement over the entirety of each property—based on negotiated and unambiguous language in the agreements. The Dicksons insist that the easement, albeit at one time a floating easement, has been fixed to where the 100 Line sits and draws the easement lines at no less than 66 feet and no more than 100 feet in width. Close Armstrong also contends that the easement has become fixed to the 100 Line and draws its lines at 66 feet wide, or at worse 200 feet wide. Both property owners say Trunkline would need to exercise all its rights within these judicially-imposed swaths.

---

[4] The court refers to a singular easement throughout the opinion for readability and recognizing that the language of the right-of-way agreements remains the same between the two grants, though naturally separate easements exist on the two properties.

Quite a gap exists among their respective line drawing, and the parties invite the court to use the law to fill the gap. The court begins by laying the law's landscape in this area because it ultimately makes the path it must travel here easier.

A. *Fixed and Floating Easements in Indiana.*

An easement is a nonpossessory "interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose." *Howard v. United States*, 964 N.E.2d 779, 781 n.2 (Ind. 2012). Often one casually thinks of an easement as a physical path, but in the law an easement is the interest—the "right to use another's land for a specified purpose." *Town of Ellettsville v. DeSpirito*, 111 N.E.3d 987, 990 (Ind. 2018). The easement's owner, known as the dominant estate, "possesses all rights necessarily incident to the enjoyment of the easement." *Newforth v. Bault*, 120 N.E.3d 594, 600 (Ind. Ct. App. 2019). "The owners of the property over which the easement passes, known as the servient estate, may use their property in any manner and for any purpose consistent with the enjoyment of the easement." *Id.*; *see also Rehl v. Billetz*, 963 N.E.2d 1, 6 (Ind. Ct. App. 2012).

Neither may interfere with the other. "The titleholder of the dominant estate cannot subject the servient estate to extra burdens any more than the holder of the servient estate can materially impair or unreasonably interfere with the use of the easement." *Howard*, 964 N.E.2d at 781. An easement owner "may make such repairs, improvements, or alterations as are reasonably necessary to make the grant of the easement effectual." *Newforth*, 120 N.E.3d at 600. The landowner (servient estate) must "permit the dominant owner to enjoy [its] easement without interference." *Id.*

Indiana recognizes two types of easements relevant here: fixed and floating. *DeSpirito*, 111 N.E.3d at 990; *Close Armstrong, LLC v. Trunkline Gas Co., LLC*, 434 F. Supp.3d 658, 673 (N.D. Ind. 2020). A fixed easement is one where the instrument creating the right-of-way specifies its location or one where the law specifies its location based on history, use, or consent. *DeSpirito*, 111 N.E.3d at 990; *see, e.g., Dudgeon v. Bronson*, 64 N.E. 910, 910 (Ind. 1902) (person's use of 16-foot right-of-way on neighbor's land for more

than twenty years fixed her easement there); *Rees v. Panhandle E. Pipe Line Co.*, 452 N.E.2d 405, 410 (Ind. Ct. App. 1983) (easements for four pipelines, otherwise undefined in size by the granting instrument, fixed by law to 66-feet wide to maintain visibility and to ensure safety); *see generally Henning v. Neisz*, 268 N.E.2d 310, 314-16 (Ind. Ct. App. 1971) (easement undefined in its locality and duration "may become fixed by use and acts of acquiescence of the parties").

In contrast, a floating easement (also known as a blanket easement) is one that is not limited to any specific part of the servient estate. *DeSpirito*, 111 N.E.3d at 990. "Blanket easements historically have been common tools for utilities, pipelines, railroads, and other infrastructure. These rights-of-way traditionally permit easement holders to place such infrastructure anywhere on the property of concern— a much easier task when constructing a utility line or pipeline designed over great distances." *Close Armstrong*, 434 F. Supp.3d at 673-74. Outside of legislative prohibitions in certain states, and none exist in Indiana, the law generally continues to enforce floating easements. *See id.* at 674 (citing cases). Whether an easement has become fixed is a mixed question of law and fact. *DeSpirito*, 111 N.E.3d at 990.

B.  *The Freedom to Contractually State an Easement's Purposes.*

This case concerns an express easement—one put to writing for both properties in 1959, signed by the then-landowners, and used by Trunkline since 1960. Once given or held, property rights aren't so easily taken or reclaimed. The law protects property rights.

For instance, Indiana has laws against theft and conversion, and even restricts the prescriptive gain of easement rights unless a claimant has met strict and often-lengthy requirements of adverse use, *see Shields v. Taylor*, 976 N.E.2d 1237, 1245 (Ind. Ct. App. 2012), or pure necessity, *see Windgate Props., LLC v. Sanders*, 93 N.E.3d 809, 813 (Ind. Ct. App. 2018). The Indiana Constitution, mirroring the United States Constitution, constrains the taking of property for purely private uses. *See* Ind. Const., art. I, § 21; *Pulos v. James*, 302 N.E.2d 768, 771 (Ind. 1973); *see also State v. Kimco of Evansville, Inc.*, 902 N.E.2d 206, 211 (Ind. 2009); *Gamble v. Eau Claire Cnty.*, 5 F.3d 285, 287 (7th Cir. 1993). Easement rights cannot be taken without

compensation, *see State v. Dunn*, 888 N.E.2d 858, 862 (Ind. Ct. App. 2008), and the mere non-use of an easement right won't result in its abandonment or extinction, *see Consol. Rail Corp., Inc. v. Lewellen*, 682 N.E.2d 779, 783 (Ind. 1997). "Property rights in Indiana are not so flimsy that they may be modified or eliminated if their exercise impedes what is thought to be a more productive or worthwhile use of land." *DeSpirito*, 111 N.E.3d at 988.

With an express grant of an easement, Indiana protects the right of the parties to state clearly its scope and future uses. "Indiana courts recognize the freedom of parties to enter into contracts" and "presume that contracts represent the freely bargained agreement of the parties." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012); *see also Pond v. Pond*, 700 N.E.2d 1130, 1136 (Ind. 1998) ("It is well established that the public policy of this state generally favors the freedom of contract between private parties. There is a very strong presumption of enforceability of contracts that represents the freely bargained agreement of the parties.") (quotations omitted); *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1129 (Ind. 1995) ("in the best interest of the public not to restrict unnecessarily persons' freedom of contract"). So favored is this right in Indiana that its recognition accepts the possibility that parties might contract improvidently. *Pinnacle Comput. Servs. v. Ameritech Publ'g*, 642 N.E.2d 1011, 1015 (Ind. Ct. App. 1994) ("People should be entitled to contract on their own terms without the indulgence of paternalism by the courts in the alleviation of one side or another from the effects of a bad bargain."); *Rutter v. Excel Indus., Inc.*, 438 N.E.2d 1030, 1031 (Ind. Ct. App. 1982) (same).

Given this freedom, the easement's *purpose* remains the "the focal point in the relationship [that] exists between the titleholders of the dominant and servient estates." *Klotz v. Horn*, 558 N.E.2d 1096, 1099 (Ind. 1990); *see also Howard*, 964 N.E.2d at 781; *Newforth*, 120 N.E.3d at 601. An easement often arises to fill some need or serve some purpose, and its extent or scope is "determined by the purpose served by the easement." *Howard*, 964 N.E.2d at 781; *McCauley v. Harris*, 928 N.E.2d 309, 314 (Ind. Ct. App. 2010) ("well established that easements are limited to the purpose for which they are granted").

10

"The servient estate is burdened to the extent necessary to accomplish the end for which the dominant estate was created." *Howard*, 964 N.E.2d at 781.

The court thus must ascertain and give effect to the intention of these parties as determined by their respective right-of-way agreement. *See Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 752 (Ind. 2018). The court "must interpret the contract as written, not as it might have been written." *B&R Oil Co., Inc. v. Stoler*, 77 N.E.3d 823, 829 (Ind. Ct. App. 2017). Without an ambiguity in the right-of-way agreement, the court interprets "the grant as a matter of law from the plain and ordinary meaning of [its] language." *McCauley*, 928 N.E.2d at 314. Extrinsic evidence cannot be used to alter its terms or explain the parties' intent. *Larry Mayes Sales, Inc. v. HSI, LLC*, 744 N.E.2d 970, 972 (Ind. Ct. App. 2001). The court may not "write a new contract for the parties or supply missing terms." *B&R Oil*, 77 N.E.3d at 829. The court must read the right-of-way agreement to effectuate all its parts. *See Tazian v. Cline*, 686 N.E.2d 95, 97 (Ind. 1997); *McCauley*, 928 N.E.2d at 314.

C.   *The Purposes of the Trunkline Right-of-Way Agreements.*

Trunkline's right-of-way agreements are clear. For today's analysis, they state three purposes for its easement across these two properties. First, they permit Trunkline to construct, maintain, and replace "one or more" pipelines anywhere across these two properties. This right was exercised initially by constructing the 100 Line in the 1960s. Second, Trunkline preserved a future right, "at any time or from time to time," to construct, maintain, and replace "one or more additional lines of pipe"—"said additional lines not to necessarily parallel any existing line laid under the terms of this agreement." To date, Trunkline has not yet exercised this future right. Third, Trunkline retained "the right to select, change, or alter the routes of [these] pipe lines . . . over[] and through lands which the undersigned owns or in which the undersigned has an interest." This right too Trunkline has not yet used on the properties owned by the Dicksons or Close Armstrong. On balance, the right-of-way agreements reserved to the landowners the right to "fully use and enjoy said premises" except for the "*purposes* herein granted" to Trunkline.

This trinity of purposes reflects the intent to grant Trunkline flexible rights to lay not just one pipeline but additional, non-parallel pipelines as the company needed—by definition, a blanket easement and an expansive one. Trunkline argues that these grants conferred "expandible" rights—but not really, because the rights to use these properties for these purposes existed in 1959 and still exist. It was in the beginning a multipurpose grant. Only the uses reasonably necessary on the land might evolve. The right-of-way agreements recognize that Trunkline would not immediately exercise all its rights at once, and that indeed the company might have cause to exercise rights yet in the future "at any time or from time to time." "By their plain terms, the agreements thus expressly contemplated upon execution that the pipelines and their corridors may not always be 'fixed'—either by original location or by ultimate number." *Close Armstrong*, 434 F. Supp.3d at 675.

This right of future use isn't uncommon—for a "property right confers on its owner among other benefits an option not to develop or exploit his property [right] immediately or continuously," until the time is suitable or desirable. *Enbridge Pipelines (Ill.) L.L.C. v. Moore*, 633 F.3d 602, 607 (7th Cir. 2011). An easement is a "right, given in perpetuity, to do an act on the land of another," *Selvia v. Reitmeyer*, 295 N.E.2d 869, 873 (Ind. Ct. App. 1973), but "[t]here is a crucial difference between the going into effect of a granted right and the exercise of the right by its holder once it has gone into effect," *Am. Land Holdings of Ind., LLC v. Jobe*, 604 F.3d 451, 458 (7th Cir. 2010). An easement grant might contemplate any number of purposes or uses appurtenant to its grant, and they are not so blithely lost merely by the passing of time. *See id.* (property right "took effect in 1903 and so would not have been forfeited even if the mining of the coal had not begun until 2000"); *Ind. Broad. Corp. v. Star Stations of Ind.*, 388 N.E.2d 568, 573 (Ind. Ct. App. 1979) ("a limitation[] which would terminate an easement must be clearly established").

In the context of blanket easements, parties remain free to restrict the easement holder's rights from changing a pipeline or placing a future pipeline, such as language prohibiting alteration of the pipeline's course, by foreclosing additional pipelines, or by expressly providing that additional pipelines

must be placed within the same corridor as the first one. *See Close Armstrong*, 434 F. Supp.3d at 675 (citing cases). "Such easement agreements of greater limitation have been around for decades, with cases interpreting them to boot. Accordingly, the parties understood how to draft limitations on an otherwise blanket easement if they wanted to do so. Unlike more restrictive floating easements, Trunkline's right-of-way agreements contain no like limitations within their express language." *Id.*

Telling at this stage, none of the parties argues a different view of the plain language. Instead, Trunkline clings to the right-of-way language, whereas the property owners target equitable doctrines to fix the easement and wrestle this unholy trinity of purposes to the ground, notwithstanding the plain language of the grants. To that road the court now goes.

D.   *Fixation by Practice or Use.*

The landowners argue that Trunkline's easement has become fixed by practice or use. The landowners contend that the court has the discretion to fix, to a reasonable and necessary location, an easement that has not been defined by a precise width or path. *See Panhandle E. Pipe Line Co., v. Tishner*, 699 N.E.2d 731, 734 (Ind. Ct. App. 1998). Not doing so, they lament, inhibits placement of their land into federal agricultural conservation easements.

"Regrettably, the case law in Indiana on whether an easement is fixed or floating, or how a floating easement becomes fixed, remains sparse." *Close Armstrong*, 434 F. Supp.3d at 676. The court and talented trial counsel together have found only two cases when Indiana courts have used the phrase "floating easement" or "blanket easement." *DeSpirito*, 111 N.E.3d at 990; *Lake Erie & W. R.R. Co. v. Ziebarth*, 33 N.E. 256, 258 (Ind. Ct. App. 1893); *cf. Burrow v. Terre H. & Logansport R.R. Co.*, 8 N.E. 167, 169 (Ind. 1886). No one has cited an Indiana case when a floating easement was permitted to remain floating. On the flip side, no one has cited an Indiana case in which a multipurpose floating easement with future rights such as those reserved in these grants became fixed to the location of one exercised use.

The court views the issue of future rights as circling a singular early question—whether Indiana law must fix future and unexercised rights of a multipurpose floating easement.[5] If the answer to this question is no, then Trunkline prevails on summary judgment because these right-of-way agreements conferred on the pipeline company multiple rights fully contemplating that they could be exercised yet in the future and unlimited to a precise corridor. If the answer to this question is yes, then this record presents a triable issue on what is reasonable and necessary to accommodate all purposes. Because Indiana exalts the freedom of contract, because these agreements are clear in specifying their multiple purposes, and because no one has articulated a public policy against floating easements of this nature— and indeed, to the contrary, because the law recognizes such floating easements—the law would not permit the court to restrict the plain terms of these right-of-way agreements. As a matter of law, and even taking all reasonable inferences in favor of the landowners on this record, fixing easement rights for all purposes makes no sense here and wreaks havoc to the plain right-of-way grants.

The court starts with the railroad easements of the late 1800s that, like the burgeoning natural gas pipeline system that developed in our country after World War II, often required blanket easements to construct the assemblage of lines that exist today. In *Burrow*, 8 N.E. at 168, a landowner granted an easement to a railroad for the purpose of building a railway. The right-of-way instrument specified a 99-foot-wide easement, but otherwise allowed the railroad to select its location. *Id.* Although the terms "floating" or "blanket" easement never appear in the opinion, the easement was undoubtedly one. *See DeSpirito*, 111 N.E.3d at 990. The railroad held a vested interest in the land for a singular purpose, though yet to be used. *Burrow*, 8 N.E. at 170. Because "[i]t cannot be known in advance where the railway will be located," "such contracts as the present must be understood as vesting in the railway company a right to select a location," albeit "within fair and reasonable restrictions." *Id.* at 169. Indiana law thus permitted

---

[5] "I long have said there is no such thing as a hard case. I am frightened weekly but always when you walk up to the lion and lay hold the hide comes off and the same old donkey of a question of law is underneath." —Oliver Wendell Holmes, Jr.

the railroad to select its corridor for its future use—not the court—and to do "any act within the grant, and reasonably necessary to enjoy the easement granted" so long as "fair and reasonable." *Id.* at 169-70.

Thereafter came *Ziebarth* (floating railway easement) and *Tishner* (floating pipeline easement turned fixed easement)—decisions from the Indiana Court of Appeals. In *Ziebarth*, 33 N.E. at 257-58, a railroad procured a floating easement to construct a railway over 80 acres of property called the Heise land in 1870. Once placed, the easement by grant would be 100 feet wide. *Id.* at 258. The grant included the right to use materials from this strip of land to build the railway. *Id.* at 259. The railway was projected to run from Muncie, Indiana to the Illinois border. *Id.* at 257. Instead of placing the railway on the Heise land, the railroad constructed it on other property to the north. *Id.* at 257-58. When the town of Boylston developed on the Heise land, and business increased in 1889, the railroad expanded its operations with a switch, using soil from the Heise land to do so. *Id.*

The court held that the floating easement over the Heise land "would only be rendered effectual, and made to operate as a conveyance of title to any part, by the actual location of the route of the [railway] across the tract of land described, which location would for the first time render the deed applicable to a specific piece of the land." *Id.* at 258. Based on the facts, the court held that the railroad had abandoned its intent to place a railway over the land after 19 years of non-use and given the railway's location elsewhere, so it was estopped to assert an easement in the Heise land. *Id.* A jury verdict for damages to the property was thus affirmed. *Id.* This case concerned only a singular-use easement and its abandonment by employing its use on altogether different land—not mere non-use but an intent to abandon by exercising this use elsewhere. At the same time, it recognizes the enforceability of floating easements in Indiana, even as reserved for future use.

In *Tishner*, 699 N.E.2d at 734, the Indiana Court of Appeals provided additional guidance on how easements otherwise floating can be "fixed by practice" in interpreting a pipeline right-of-way agreement, though different from the right-of-way agreements here. A gas company had "the right to lay, maintain,

operate, repair, replace, change the size of, and remove a pipeline." *Id.* The agreement also said the gas company could at any time in the future lay a "second line of pipe," albeit only "alongside of the first line." *Close Armstrong*, 434 F. Supp.3d at 678. The gas company laid one pipeline and later needed to do work on it, including removing the landowner's brick wall and various trees and shrubs. *Tishner*, 699 N.E.2d at 735. Following their removal, the landowner tried to restore them. The company sought injunctive relief and argued that this development interfered with its easement rights to maintain the pipeline. *Id.*

In assessing the parties' rights, *Tishner* noted that an "easement of indeterminate width is not an easement across the entirety of [the landowner's] property, rather, it is only an easement over the area reasonably necessary to carry out the purposes of the easement." *Id.* at 738. The court further noted that a trial court "may determine the extent of an easement of undefined width." *Id.* At trial, the gas company introduced evidence that 66 feet was all the company needed for the purpose of maintaining and repairing the one pipeline. *Id.* The court thus affirmed the trial court's determination that the pathway was only 66 feet in width. *Id.* at 739; *see also Rees*, 452 N.E.2d at 410. The landowners want badly to characterize *Tishner* as fixing a multipurpose floating easement, but at trial the gas company only asserted one purpose for the court to consider—maintenance and repair of one installed pipeline. *Tishner*, 699 N.E.2d at 738. Indeed, at no time does the opinion reference language of the grant allowing a parallel second pipeline. Nor does the opinion address other future floating rights as Trunkline retains in these right-of-way agreements.

"The modern bookend to this history of fixed and floating easements is *DeSpirito*." *Close Armstrong*, 434 F. Supp.3d at 677. A utility easement traversed two lots once they were subdivided. *DeSpirito*, 111 N.E.3d at 990. Without an express grant, *DeSpirito* examined a recorded subdivision plat that delineated an easement with a dotted line. *Id.* One landowner wanted to move the utility easement to increase the building space for a convenience store and argued that the easement was not "fixed," saying "the plat describes only the easement's width, not its location in relation to the lot's boundaries."

*Id.* The Indiana Supreme Court disagreed, finding the path's measurements were determinable from the subdivision plat's scaling. *Id.* at 991. Significantly, the court also called the easement fixed by practice: "even if the plat were not drawn to scale, the disputed easement is fixed by practice." *Id.* The court observed that when "the right to an easement is granted without giving definite location and description to it, the exercise of the easement in a particular course or manner, with the consent of both parties, renders it fixed and certain." *Id.* (quoting *Dudgeon*, 64 N.E. at 910).

Within this tradition of floating easements, the landowners point out that Indiana law permits the court to fix easements otherwise left undefined:

> If the grant or reservation is specific in its terms, it is decisive of the limits of the way. Thus, where the language of the instrument leaves no doubt as to its meaning, the court has no discretion to expand the terms of the way. On the other hand, where a conveyance of a right-of-way does not specifically define it, the general rule as variously stated is that the grantee is entitled to, and only to, such a way as is reasonably necessary and convenient for the purposes for which it was created.

*McCauley*, 928 N.E.2d at 315 (quoting 28A C.J.S. Easements § 198 (2008)); *see, e.g., Murat v. South Bend Lodge No. 235 of the Benevolent & Protective Order of Elks*, 893 N.E.2d 753, 755-56 (Ind. Ct. App. 2008) (evaluating whether easement specified its width to apply this doctrine); *Jeffers v. Toschlog*, 383 N.E.2d 457, 460 (Ind. Ct. App. 1978) ("No width of the easement was stated. The trial court had authority to construe the easement provision in a manner which would carry out the intentions of the parties."); *Vanatta v. Waterhouse*, 71 N.E. 159, 160-61 (Ind. Ct. App. 1904) (same).

In *Rees*, 452 N.E.2d at 410, for instance, separate corridors for four pipelines, otherwise undefined in scope by the granting instruments, were permitted by law to be defined by the trial court each as 66-feet wide based on a singular purpose of the easement grants—namely to operate a pipeline safely.[6] This

---

[6] Both *Rees* opinions suggest multiple easements by separate grants. The 1983 opinion used language like "easement rights," "these easements," "each easement," and "easements were created." *See Rees*, 452 N.E.2d 405, 407, 410. The 1978 opinion used similar descriptions: "Panhandle possesses right-of-way easements for the operation and maintenance of four (4) underground natural gas pipelines," "lines were constructed pursuant to easement grants," and "Panhandle employees were attempting to clear brush and trees from one of the easement rights-of-way." *Rees v. Panhandle E. Pipe Line Co.*, 377 N.E.2d 640, 643 (Ind. Ct. App. 1978).

wasn't seemingly done to address floating easements, and certainly not done to address future rights of use, but to fix otherwise undefined easements based on their exercised use. *Rees* held that fixing the easements "was a *reasonable* determination [because] the parties had intended the pipeline areas to remain safe and that 66 feet was *necessary* to ensure such safety." *Id.* (emphases added). Exercise of the easement right in a particular course—namely to maintain and repair the laid pipelines—only required 66 feet and thus each became fixed or defined to its pathway. Each easement's purpose informed fixation.

In *Shedd v. Am. Maize Prods. Co.*, 108 N.E. 610, 612 (Ind. Ct. App. 1915), a manufacturer of food products received an express grant to construct two pipelines—one for sewer outfall and the other for water intake from Lake Michigan. The deed gave the company the option to change the grade, but not the route, of these pipelines. *Id.* at 618. The court held that the "interested parties under such a grant may make any reasonable location of the easement on the property over which it is to extend, so long as they do not encroach upon or interfere with other property." *Id.* at 615; *see also id.* at 619. Much like *Burrow*, 8 N.E. at 169, *Shedd* permitted the company unilaterally to set the easement's location (without the grantors), and held that "the mere fact of delay in completing the line would not necessitate a relocation of the part not laid until a later date." *Shedd*, 108 N.E. at 620. Once set, the company could extend the pipelines at the same location and in the same direction as the original pipelines. *See id.* at 614.[7]

The court sees no real difference in these fixation practices. *See DeSpirito*, 111 N.E.3d at 991 ("Where the right to an easement is granted without giving definite location and description to it, the exercise of the easement in a particular course or manner, with the consent of both parties, renders it fixed and certain."). The principle of law growing from this tradition is that, once fixed, "neither the servient nor dominant estate-holder can relocate or modify the easement *without the other's consent.*" *Id.* at

---

[7] The court notes that another *Rees* decision distinguished *Shedd* as addressing "the location and direction that the prolongation of a pipeline would take," whereas *Rees* addressed "the extent of a definitely-located easement," but that was solely within the context of addressing the procedural availability of an injunction. *Rees*, 377 N.E.2d at 652.

994 (emphasis added); *accord Henning*, 268 N.E.2d at 314 ("it cannot be changed by either party without the consent of the other"). This rule applies equally to easements by necessity and easements by express grant. *DeSpirito*, 111 N.E.3d at 994; *see, e.g., Dudgeon*, 64 N.E. at 910 (person's use of sixteen-foot right-of-way on neighbor's land for necessity was "the same as if her deed from the owner of the servient tract had expressly granted and described a way sixteen feet wide").

The landowners run headlong into a fundamental challenge at this point—they consented. They consented already. Their right-of-way agreements not merely permitted Trunkline to install and maintain the 100 Line in 1960 and to select its corridor for that purpose, within "fair and reasonable restrictions," *Burrow*, 8 N.E. at 169, but at any time in the future ("at any time or from time to time") to install additional non-parallel pipelines elsewhere on the properties and to "alter" or "change" the "routes." If these right-of-way agreements, like so many cases advanced by the landowners, including *Burrow* and *Tishner*, had but the one purpose—selecting a corridor for a single pipeline, or even a single corridor for two parallel pipelines—this might well be a mine-run fixation case. The landowners struggle to explain why equity should fix something that by express grant they agreed was moveable. Property rights aren't so casually protected, *see supra*, nor are freely bargained contract rights so easily discarded, *see State v. Int'l Bus. Machs. Corp.*, 51 N.E.3d 150, 160 (Ind. 2016).

The landowners also must confront a second conundrum. Almost by definition, the law cannot fix by use something that hasn't been used. No Indiana case has fixed future exercisable—but not yet exercised—non-parallel pipeline rights of use (or relocation rights). Outside poorly defined pathways, which here the parties differently consented to be moveable, the only time the fixation doctrine has been used in Indiana is when the dominant estate has exercised a right of use. *See DeSpirito*, 111 N.E.3d at 991. The law guards against forfeiture, abandonment, and extinguishment by saying non-use alone won't cause the easement holder to lose its rights of use, *see Conrail*, 682 N.E.2d at 783; *Jobe*, 604 F.3d at 458; *see, e.g., Ziebarth*, 33 N.E. at 258, and the parties haven't argued this occurred here. Nor have they argued that

these other future rights terminated after the exercise of one use—namely that Trunkline held only an easement in determinable fee. *See GTA v. Shell Oil Co.*, 358 N.E.2d 750, 75253 (Ind. Ct. App. 1977); *see Atmos Energy Corp. v. Paul*, 598 S.W.3d 431, 452 (Tex. Ct. App. 2020) ("A grant may authorize a use greater than the one actually used, and such prior use does not nullify the greater rights conveyed in the grant.").

The law confers on Trunkline the option to exercise its rights in the future and to select, consistent with the right-of-way agreements and consistent with the law, then a location for its uses. *See Burrow*, 8 N.E. at 169. These purposes of the easement matter. *See DeSpirito*, 111 N.E.3d at 990; *Howard*, 964 N.E.2d at 781; *Klotz*, 558 N.E.2d at 1099. These purposes have yet to be fulfilled and remain active. The omission of any specific location for any of the pipelines or for the exercise of these expansive future rights (relocation and additional pipelines) was "deliberate and forward-looking." *Atmos Energy*, 598 S.W.3d at 451. Trunkline bargained for the rights to lay new pipelines elsewhere and to relocate pipelines. Its easement, as the collection of this rights, could expand in its use. No landowner has asked the court to fix merely Trunkline's one use and leave to the future its other uses—no, the landowners want all rights of use for all purposes fixed today. But not all have been used to define how they should be so fixed, and that too takes this doctrine too far. Neither *Dudgeon* nor *DeSpirito* fixed an inherently moveable right or one not yet exercised. By their plain terms, these right-of-way agreements expressly envision that the pipelines and their corridors may not always be "fixed"—"either by original location or by ultimate number." *Close Armstrong*, 434 F. Supp.3d at 675.

The "equity court's authority is not without limitation." *Becker v. MacDonald*, 488 N.E.2d 729, 733 (Ind. Ct. App. 1986); *see also Whitcomb v. Chavis*, 403 U.S. 124, 161 (1971). The landowners take the equity of fixation too far. They cannot use equity as an escape hatch for their consent, particularly when the definition of this equitable remedy expressly accommodates the possibility of their consent. *See DeSpirito*, 111 N.E.3d at 994. The "equity [that] must be done is that which should have been done." *Becker*, 488 N.E.2d at 733; *see also Marling Fam. Trust v. Allstate Ins. Co.*, 981 N.E.2d 85, 89 (Ind. Ct. App. 2012). Saying

a corridor must be fixed for all purposes of the right-of-way agreements would exceed that which should have been done, given that the agreements spell out quite clearly that what may be done is to change routes altogether or select entirely new ones. "[T]he hardship of the case, and the failure of the mode of procedure established by law, is not sufficient to justify a court of equity to depart from all precedent and assume an unregulated power of administering abstract justice at the expense of well-settled principles," *Heine v. Levee Comm'rs*, 86 U.S. 655, 658 (1873), including contract principles.

Notably, the landowners have not pointed to an Indiana case that abides by a mere "use it or lose it" principle when it comes to future exercisable easement rights, and not surprisingly as the law requires more to cause a dominant estate-holder to lose such a right. "An easement is a substantial interest in realty, one which the law will protect, and for its obstruction or destruction furnishes a remedy. If one threaten to obstruct or destroy an easement, equity will enjoin; and if one deny the existence or title to an easement, a court of equity will establish it, and quiet the title." *Kammerling v. Grover*, 36 N.E. 922, 924 (Ind. Ct. App. 1894); *see also Hay v. Baumgartner*, 870 N.E.2d 568, 572 (Ind. Ct. App. 2007) (easements are enforced in equity); *Sizemore v. H & R Farms*, 638 N.E.2d 455, 458 (Ind. Ct. App. 1994) ("The trial court did not abuse its equitable discretion by simply declaring that the easement was, in reality, a general, unlimited easement.").

Once a path is fixed, one cannot move it—that's the point of equity in the eyes of the landowners no matter what the right-of-way agreements say—but the parties specifically contracted for a different easement with a bundle of different purposes, including a future purpose to alter a route, yet to be fulfilled. The court cannot, even as a court of equity, rewrite contracts for dissatisfied parties, not least when they consent to something being by its nature mutable. *See DeSpirito*, 111 N.E.3d at 988, 994; *Cutter v. Jurus*, 177 N.E.3d 492, 496 (Ind. Ct. App. 2021) (equity limited in reforming contracts); *Becker*, 488 N.E.2d at 733 ("court is not at liberty, even in equity, to rewrite the contract for them"). The law proves wary of "unsettle[ing] property values by frustrating the contracting parties' expectations." *DeSpirito*, 111

N.E.3d at 995. "Parties often bargain over an easement's type and location when first creating an easement. Allowing one party to thwart that bargain may result in a windfall for one party and a corresponding shortfall for the other, thus depriving it of its bargain." *Id.*

In the sheep's clothing of fixation, the landowners want in truth to introduce the wolf of altering the plain terms of the grants that govern the scope of Trunkline's easement—its rights of use for specified purposes. The landowners take fixation so far as to cloak it now as extrinsic evidence to rewrite the right-of-way agreements. And that improperly bleeds an equitable remedy into a legal bar. The landowners aren't just seeking to have the court fix the location (and width) of the one right Trunkline has exercised (the 100 Line), but to confine otherwise broad future rights exercisable across the property under this blanket easement to this same location and thereby rewrite otherwise unambiguous grants. That the court won't do, nor does Indiana law permit it on this record. The court cannot use extrinsic evidence to alter unambiguous terms of the right-of-way agreements. *Larry Mayes Sales*, 744 N.E.2d at 972.

"The purpose of extrinsic evidence is not to create an ambiguity, but to inform one." *Close Armstrong*, 434 F. Supp.3d at 671 (citing *Bar Plan Mut. Ins. Co. v. Likes Law Off., LLC*, 44 N.E.3d 1279, 1285 (Ind. Ct. App. 2015)). Nothing advanced by the landowners compels the court to alter unexercised rights as a matter of law; and none of the evidence, even taking it in the light most favorable to them, would permit a reasonable factfinder to go beyond fixing a location of an exercised use and now fix the location of all bargained-for, but not-yet-exercised, uses to that same area.[8] The history of practice and

---

[8] Even one of the more eye-catching letters from Trunkline from March 1998 that might be used to assist the law in defining a reasonable and necessary location for its exercised right on Close Armstrong's land, though not to extrinsically alter the right-of-way agreement, noted clearly in reservation that Trunkline had "an open easement with additional pipeline rights." Nothing in the associated "stump agreement" could be used by a reasonable factfinder to cancel Trunkline's other pipeline rights under unequivocal right-of-way agreements. At most, these documents and others speak to that swath reasonable and necessary to maintain, reconstruct, or operate the 100 Line. A later communication, dated April 28, 1998, for instance, never foreclosed Trunkline from its many rights of use, but asked whether the parties could agree about any easement on the property already. Even if the court were inclined to consider entirely separate communications or agreements with other property owners (a question the court defers for trial or pretrial motion), they have no bearing on Trunkline's future rights, and, at most, would only bear on the reasonable and necessary width for the 100 Line.

use of the 100 Line doesn't inform what is reasonably necessary to carry out the remaining easement purposes. Trunkline's exercise of one right doesn't negate or eliminate unexercised rights expressly contemplated in the right-of-way agreements.

Noticeably absent from *DeSpirito* and *Dudgeon*, in either the language of the grant, or the rights asserted, was a contracted right for future use outside the one path selected—there was no provision that an exercised easement right could be altered or relocated, and there was no future right at issue to place additional improvements (railways, utilities, or pipelines) elsewhere on the properties. In *Dudgeon* and *DeSpirito*, the fixation of a defined path was compatible with the one right of use that had been exercised. The purposes of today's right-of-way agreements also distinguish *Tishner*—there a fully-exercised right to lay an immovable pipeline. Today's 100 Line is not so permanent—its route can be altered, changed, and the pipeline relocated altogether, albeit consistent with the right-of-way agreements and the law. The pipeline in *Tishner* wasn't going anywhere; the parties didn't bargain for that right. Trunkline and the landowners did. Even in *Rees*, 452 N.E.2d at 410, fixing the separate easements for four pipelines (otherwise undefined in scope by the granting instruments) to maintain visibility and to ensure safety didn't hinder the purpose of the grants. The court must use the guideposts of these cases to tread the ground here.

To the extent the question is whether Trunkline has future exercisable rights to alter the route of the 100 Line or to install additional pipelines, the answer is still indisputably yes. *See Close Armstrong*, 434 F. Supp.3d at 681-83. To the extent the question posed today is whether these future exercisable rights can be fixed on this record, the answer is indisputably no. As it pertains to these future uses, that is the only question that is ripe today and the only one that presents an actual controversy. Should Trunkline in the future decide to move its 100 Line, or to install an additional pipeline, as its right-of-way agreements permit, the law will require that the company act in a reasonable and necessary manner. *See Tishner*, 699 N.E.2d at 738 ("only an easement over the area reasonably necessary to carry out the purposes of the

easement"); *Burrow*, 8 N.E. at 169 ("within fair and reasonable restrictions"); *see also Atmos Energy*, 598 S.W.3d at 459 (same). An easement owner "may make such repairs, improvements, or alterations as are reasonably necessary to make the grant of the easement effectual," *Newforth*, 120 N.E.3d at 600, but the easement owner "cannot subject the servient estate to extra burdens any more than the holder of the servient estate can materially impair or unreasonably interfere with the use of the easement." *Howard*, 964 N.E.2d at 781.

In the context of the Declaratory Judgment Act, district courts "*may* declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a) (emphasis added). "By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995). The phrase "case of actual controversy" within the Declaratory Judgment Act refers to the types of cases or controversies that are justiciable under Article III of the Constitution. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937). Disputes must be "definite and concrete, touching the legal relations of parties having adverse legal interests," and they must be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune*, 549 U.S. at 127 (quoting *Aetna Life*, 300 U.S. at 240-41). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

What will be reasonably necessary for any movement, replacement, or placement of a pipeline in the future will be a fact-sensitive inquiry to be made at that time. The court cannot today take out its crystal ball and draw easement lines based on abstract possibilities—not least given the unique geographic

and topographic complexities of these properties, or the potential for future development that these right-of-way agreements reserve to the landowners consistent with their right to "fully use and enjoy said premises." It would be like hitting a moving and, frankly, unrealized yet-to-be-used target. Any attempt would inevitably miss the mark. The court declines even more strongly to wade into such abstract and hypothetical scenarios given the permissiveness of its declaratory powers, and the constitutional need for not just actual controversies, but ripe ones. *See T.H.E. Ins. Co. v. Olson*, 51 F.4th 264, 270 (7th Cir. 2022) ("Ripeness doctrine is meant to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.") (quotations omitted); *Cent. States v. Am. Int'l Grp.*, Inc. 840 F.3d 448, 451 (7th Cir. 2016) (declaration regarding "hypothetical future medical claims arising from injuries that have not yet occurred" was "clearly unripe"); *Solo Cup Co. v. Fed. Ins. Co.*, 619 F.2d 1178, 1188-89 (7th Cir. 1980) (declaration that insurer must indemnify for yet-to-be-filed lawsuits was unripe).

Trunkline has these future rights. It did in 1959. It does today. If the question is where Trunkline may exercise these rights in the future, outside of calling this easement floating across these properties and until these rights are exercised, abandoned, or extinguished, the court cannot say what might tomorrow prove to be reasonable and necessary reflections of these uses. A floating easement over the properties is what is reasonably necessary today to carry out the future purposes of this easement. *See DeSpirito*, 111 N.E.3d at 990; *Howard*, 964 N.E.2d at 781; *Klotz*, 558 N.E.2d at 1099. At the end of the day, no Indiana case fixes future unexercised rights of a multipurpose floating easement—what Indiana law does do is enforce freely bargained contracts. *See IBM*, 51 N.E.3d at 160.

"Despite the issue's novelty to this state, other courts—including in the Gulf states where such issues might reach the courts more readily—have reached the same conclusion under similar easements." *Close Armstrong*, 434 F. Supp.3d at 679. The court's decision today stands in line with this convincing one accord—reaffirmed just three years ago. *See Atmos Energy*, 598 S.W.3d at 446-47; *see also Aaron v. Fla. Gas Transmission Co.*, 412 F.2d 802, 802 (5th Cir. 1969); *Scherger v. N. Nat. Gas Co.*, 575 N.W.2d 578, 581 (Minn.

1998); *Nw. Pipeline Corp. v. Forrest Weaver Farm, Inc.*, 646 P.2d 422, 423-25 (Idaho 1982); *Ashcot, Inc. v. Tex. E. Transmission Corp.*, 129 So.2d 405, 405-06 (Miss. 1961); *Baker v. Tenn. Gas Transmission Co.*, 250 S.W.2d 566, 569 (Tenn. 1952)  *N. Nat. Gas Co. v. Knop*, 524 N.W.2d 668, 671 (Iowa Ct. App. 1994); *Great Lakes Gas Transmission Co v. MacDonald*, 485 N.W.2d 129, 131 (Mich. Ct. App. 1992); *Sorrell v. Tenn. Gas Transmission Co.*, 314 S.W.2d 193, 195 (Ky. Ct. App. 1958).

The landowners weave undertones of policy arguments—namely that allowing such blanket easements to exist prevents large swaths of land from being beneficially used—but they have not argued that these right-of-way agreements violate public policy, nor given the history of floating easements in this state would the court expect such argument to prevail. *See DeSpirito*, 111 N.E.3d at 988 (recognizing "Indiana's longstanding common-law rule" permitting the relocation of fixed easements with "the consent of all affected estate-holders"). Unlike certain states that have expressly prohibited blanket easements, *see*, *e.g.*, Mo. Rev. Stat. §§ 523.010, 523.282; Wyo. Stat. Ann. § 34-1-141, Indiana has not legislatively prohibited blanket easements, so they remain enforceable under the common law in this state, recognized as they are, at least since the Indiana Supreme Court's ruling in *Burrow* in 1886.

That said, the court returns to the one question left unanswered—what does the law do with the right that today has been exercised, the 100 Line? Both *Tishner* and *Rees* permit the court to define what is reasonable and necessary for Trunkline's one use there based on the facts that exist today to guide the conduct of the parties, notwithstanding that tomorrow's environmental conditions or other changed circumstances may require its repositioning to another reasonable and necessary location consistent with the right-of-way agreements. *See Close Armstrong*, 434 F. Supp.3d at 679 ("*Tishner* speaks not to the scope of contractual rights under the plain terms of the right-of-way agreements, but instead helps define the scope of an easement created by the placement of a pipeline. . . . *Tishner* may mandate that a trial court reasonably limit the scope of an easement right once a pipeline corridor has been selected and used").

The court has already answered the pure question of contract; this last question "is a mixed question of law and fact once a contract right has been exercised." *Id.*; *see also DeSpirito*, 111 N.E.3d at 990. The court views this result as marrying the rights of the parties to their contractual purposes and as much equity as equity will permit. This result adheres to Indiana's longstanding public policy favoring the freedom to contract, protects the expectations of contracting parties, and guards against judicial takings of private property. On this last question alone, and after diligent review of the evidence from all parties, the court believes a triable issue exists as to what is reasonable and necessary for this one use to date on both properties.

To emphasize for trial, Trunkline's easement (and one easement) is the right to use the land for specified purposes. *See DeSpirito*, 111 N.E.3d at 990 ("easement is the right to use another's land for a specified purpose"); *Howard*, 964 N.E.2d at 781 n.2 (same). Consistent with the court's previous opinion, this trial will only concern the definition of this exercised "easement right"—its precise width or corridor—not the extent of the easement reserved for future uses under these right-of-way agreements. *Close Armstrong*, 434 F. Supp.3d at 679. Accordingly, the court grants summary judgment for Trunkline on its future rights, and defers to trial the sole question of what corridor should be recognized as reasonable and necessary for its current use of the 100 Line. The court denies the competing summary judgment motions on this point.

E. *Acquiescence.*

The landowners argue the doctrine of acquiescence. They argue Trunkline's non-use and lack of maintenance on both properties outside a 66-foot strip of land (and one landowner's planting of trees up to that line) amounted to acquiescence. "A person with full knowledge of the facts and aware of his rights who nevertheless stands by and acquiesces in conduct inconsistent with those rights may be estopped from subsequently asserting those rights." *Kvolek v. Swickard*, 944 N.E.2d 564, 575 (Ind. Ct. App. 2011). This doctrine of acquiescence may cause "a release or abandonment of one's rights if, having rights, he

stands by and sees another dealing with his property, in a manner inconsistent with such rights, and makes no objection while the act is in progress." *Henning*, 268 N.E.2d at 316; *see, e.g., Miller v. Geels*, 643 N.E.2d 922, 930-31 (Ind. Ct. App. 1994) (tenants acquiesced in landlord's deduction of cleaning expenses from security deposit knowing a joint inspection had not occurred under the contract).

This doctrine offers the landowners no help today. The "doctrine does not apply where, as here, the question presented is the scope of the rights granted by an express easement." *Kwolek*, 944 N.E.2d at 577 (trial court erred by using acquiescence to decide whether dominant estate could use easement for both ingress and egress as well as to park cars). The "doctrine of acquiescence is a seldom used, nearly dormant doctrine that has been limited in Indiana case law only to boundary-line disputes or the location of an easement," though then with undefined prescriptive easements. *Id.* at 575; *see Huntington v. Riggs*, 862 N.E.2d 1263, 1267-68, 1274 (Ind. Ct. App. 2007) (Riley J., majority, and Friedlander, J., concurring) (boundary line dispute); *Henning*, 268 N.E.2d at 316 (undefined prescriptive easement). This isn't an undefined prescriptive easement, nor are these landowners proposing to use this doctrine merely to situate the one pipeline, but instead all rights within the scope of the easement grant.

The landowners invite the court to ignore *Kwolek*. When a federal court sits in diversity and applies state law, it looks to the law as stated by the state supreme court or endeavors to decide the matter as the state supreme court would. *BMD Contractors, Inc. v. Fid. & Deposit Co. of Md.*, 679 F.3d 643, 648 (7th Cir. 2012). "If the state supreme court has not spoken on a particular issue, then decisions of the intermediate appellate court will control unless there are persuasive indications that the state supreme court would decide the issue differently." *Id.*; *see also West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236-37 (1940); *Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 811-12 (7th Cir. 2018). The landowners advance no cogent reasons for disagreeing with *Kwolek*—particularly as it captures the development of decades and decades of Indiana law in this area. The court declines to ignore the standard in *Kwolek*, not least with a honed sense of federalism. *See Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1092 (7th Cir. 1999)

("federal court pronouncements on the content of state law inherently involve a significant intrusion on the prerogative of the state courts to control that development").

The landowners argue that *Kwolek* permits the acquiescence doctrine to decide the location of this express pipeline easement in its entirety. As much as the landowners would like to cabin their argument as merely defining a location, in truth they are seeking to employ this doctrine to restrict the scope of future uses. A judicially-imposed swath of 66 feet, they say, will accommodate the 100 Line, perhaps a replacement line in the future; but in fairness such an imposition would legitimately restrict the scope of future uses expressly reserved by these right-of-way agreements—the rights to alter the pipeline corridor altogether and the right to lay additional non-parallel pipelines elsewhere on these properties, if not other potential uses (for example, to install a pipeline loop). At oral argument, the Dicksons argued that when an express easement is fixed by practice, the rights in the agreement change. Just as *Kwolek* held that the acts of the servient estate—non-objection, length of time, practice and use—cannot add another purpose or expand the scope of an express easement, on today's record the same cannot through the lens of acquiescence negate this easement's multipurpose scope. Because the landowners have introduced into the question the scope of the rights granted by the express easement, this doctrine does not apply. *See Kwolek*, 944 N.E.2d at 577.[9]

Nor do the landowners offer evidence on which a reasonable factfinder could find acquiescence. The conduct that effects acquiescence must be inconsistent with the easement holder's rights. Trunkline's mere non-use isn't enough. *See Conrail*, 682 N.E.2d at 783. Targeted monitoring and chosen maintenance in a certain area over the pipeline for safety remain consistent with Trunkline's rights as exercised to date,

---

[9] This is reiterated by *Henning*, 268 N.E.2d at 313-16, the case *Kwolek* contrasted. The original easement in *Henning* was an express and single-use easement (one private driveway) without other future rights. *Id.* at 313-14. The easement owner decided to relocate the easement by a way of necessity and prescription; and, over five years later, the servient estate wanted to change the easement back to the original location. *Id.* at 314-16. The court held that the servient estate acquiesced in the easement's new location and thus could not change it back. *Id.* at 316. Today the court is not dealing with an easement of necessity or prescription, and instead must address multiple uses, including future uses, reserved in an express grant.

not inconsistent with its rights. That Close Armstrong's predecessor owner may have planted trees up to a certain area near the pipeline after discussion with the pipeline company likewise proves consistent with the rights reserved under these grants. The right-of-way agreements permitted the landowners to "fully use and enjoy" the premises, except for the "purposes" that Trunkline retained. No reasonable factfinder could find that this conduct was inconsistent with the grants; some or more of it may help to define a corridor under fixation, but not under this doctrine.

To that point, the agreements required the pipelines to be placed so as not to prohibit the soil's cultivation and contemplated that Trunkline would need to pay for surface damage from the construction, maintenance, and operation of "said lines," including damage to crops and fences. Planting trees isn't evidence of acquiescence, not least when future rights to pipeline routes have not yet been exercised. *See Tishner*, 699 N.E.2d at 737 n.1 (trial court erred by finding that pipeline company had lost its right to complain about improvements in its easement before 1988, though it had worked around brick walls, swimming pool, and trees before then). Pipeline companies just cut trees down when they must, often awaiting until they might jeopardize the pipeline's integrity—no different than a utility company removing a homeowner's bush to access its buried lines or electrical box. This too was consistent with the cohabitating rights of the dominant and servient estate-holders. The court grants summary judgment for Trunkline on this theory and denies summary judgment for the landowners.

F.     *Estoppel.*

The landowners next advance an estoppel theory. They seek to estop Trunkline from asserting an easement to the entirety of the property. Estoppel is a "companion" doctrine to acquiescence, *Kwolek*, 944 N.E.2d at 575, though "courts are reluctant to base their decisions on equitable estoppel in cases involving title to property as it would greatly tend to the insecurity of title if they were allowed to be affected by parol evidence of light or doubtful character," *Kokomo Veterans, Inc. v. Schick*, 439 N.E.2d 639, 644 (Ind. Ct. App. 1982) (quotations omitted).

"Equitable estoppel is available if one party, through its representations or course of conduct, knowingly misleads or induces another party to believe and act upon his conduct in good faith and without knowledge of the facts." *Metropolitan Dev. Comm'n v. Schroeder*, 727 N.E.2d 742, 752 (Ind. Ct. App. 2000). To establish estoppel, a party must demonstrate (1) a lack of knowledge and a lack of the means to know the facts in question, (2) reliance on the conduct of the party to be estopped, and (3) a prejudicial change in position based on the conduct of the party to be estopped. *Doe v. Carmel Operator LLC*, 160 N.E.3d 518, 523 (Ind. 2021); *Story Bed & Breakfast, LLP v. Brown Cnty. Area Plan Comm'n*, 819 N.E.2d 55, 67 (Ind. 2004). Equitable estoppel may arise from silence or from positive conduct, but silence will not form the basis of an estoppel unless the silent party has a duty to speak. *City of New Albany v. Cotner*, 919 N.E.2d 125, 133-34 (Ind. Ct. App. 2009).

The landowners cannot satisfy this doctrine's first requirement: that they lacked knowledge of the facts or lacked the means to know the facts in question. Indiana courts are "hesitant to allow an estoppel in those cases where the party claiming to have been ignorant of the facts had access to the correct information." *Story Bed*, 819 N.E.2d at 67. Close Armstrong doesn't argue how it lacked knowledge of the right-of-way agreement, and thereby the floating easement on its property. The Dicksons merely incorporate Close Armstrong's argument as their own, so the court likewise lacks facts and argument on this same prong (or even how the Dicksons detrimentally relied on Trunkline's conduct). The landowners have the burden to establish estoppel, but cannot do so; and jumping straight to the doctrine's second and third requirements without addressing also the first requirement reveals this inability.

Close Armstrong's predecessor in title (Glenda Marshall, through her attorney) received a copy of the right-of-way agreement outlining the parties' rights in March 1998. Chet Marshall, one of two members of Close Armstrong, also learned about the right-of-way agreement in 2017 when the company acquired the property. In addition, the right-of-way agreement was recorded and publicly available at the Stark County Recorder's Officer since 1959. *See Bank of N.Y. v. Nally*, 820 N.E.2d 644, 648 (Ind. 2005)

("purchaser of real estate is presumed to have examined the records of such deeds as constitute the chain of title thereto under which he claims, and is charged with notice, actual or constructive, of all facts recited in such records showing encumbrances, or the non-payment of purchase-money"); *see, e.g., Money Store Inv. Corp. v. Summers*, 849 N.E.2d 544, 548 (Ind. 2006) ("simple title search and/or communications with National City would have revealed that the mortgage had not been released"). Thus, Close Armstrong had not only knowledge of the facts in question but also the means to know these facts, not least when it acquired the property either from Chet Marshall or the trust that Glenda Marshall established before her passing. The Dicksons did too. The party claiming estoppel has the burden to show all facts necessary to establish it, *Story Bed*, 819 N.E.2d at 67, and for these reasons neither landowner may avail themselves of this doctrine. The court grants summary judgment for Trunkline on this theory.

G.     *Laches.*

The landowners last argue that Trunkline's non-use coupled with its acquiescence to the planting of trees and flooding on the property bars Trunkline's claim under laches. Out of the gate, this strikes as a merely repackaged acquiescence argument that cannot prevail, though the court runs the laches analysis independently. Laches requires (1) inexcusable delay in asserting a known right, (2) an implied waiver arising from knowing acquiescence in existing conditions, and (3) a change in circumstances causing prejudice to the adverse party. *SMDfund, Inc. v. Fort Wayne-Allen Cnty. Airport Auth.*, 831 N.E.2d 725, 729 (Ind. 2005). "The general doctrine is well established and long recognized: 'Independently of any statute of limitation, courts of equity uniformly decline to assist a person who has slept upon his rights and shows no excuse for his laches in asserting them.'" *Town of New Chi. v. City of Lake Station*, 939 N.E.2d 638, 652 (Ind. Ct. App. 2010).

Trunkline argues laches cannot be used as an equitable limitation on a legal claim, such as a breach of contract, but the claim asserted isn't a legal claim for breach of contract, but a request for a declaratory judgment. All parties request a declaratory judgment—and their arguments for such declarations are

based in equity (fixation and acquiescence)—where laches may operate. *See SMDfund*, 831 N.E.2d at 729 ("Because this action [for declaratory judgment] is equitable, laches may operate to bar the claim.").

That said, by law, mere non-use cannot cause an easement holder to lose its rights, *see Conrail*, 682 N.E.2d at 783; *Jobe*, 604 F.3d at 458, and an easement grant that by its express terms permits a party to exercise rights in the future "at any time or from time to time" cannot be said to have inexcusably delayed in asserting a right. This grant was again forward-looking by its nature. Allowing the landowners full use and enjoyment of their properties in the meantime, whether for trees or other uses—precisely what the right-of-way agreements contemplated—cannot be argued an implied waiver or knowing acquiescence when it has no effect on Trunkline's exercised right (100 Line) or its option to future uses. It demonstrates compliance with the grant, and indeed that proper allocation of rights between dominant and servient estate-holders contemplated by law, not laches.

Flooding on the property likewise effects no implied waiver or acquiescence under a laches theory. The parties all seem to agree that the existing conditions on the properties do not compromise the 100 Line's integrity to date, though it may impact under fixation what is the proper width to maintain it. To the extent it might be argued to affect the 100 Line's presence in the future, just as an example, this may just give cause for Trunkline to employ its option to move the pipeline under the right-of-way agreements, if reasonable and necessary.

Trunkline hasn't slept on its exercised right through its continuous maintenance of the 100 Line, nor has the company slept on its unexercised rights that by their nature can be employed in the future. The landowners haven't established that Trunkline engaged in inexcusable delay. The court thus grants summary judgment for Trunkline on this laches theory.

CONCLUSION

In the end, the court cannot ignore the plain language of the right-of-way agreements. The agreements granted a floating easement over each property to Trunkline and gave Trunkline the right to

lay the 100 Line, the right to lay additional non-parallel pipelines elsewhere on these properties, and the right to alter the course of the 100 Line. Indiana law allows in equity for judicial fixation of an exercised floating easement right, but on this record not the fixation of rights of use expressly reserved for the future that have not been abandoned or extinguished either by law or by consent.

The only triable issue is what is a reasonably necessary or fixed width to accommodate Trunkline's exercised use of that portion of the easement devoted to its 100 Line today and its needs of ingress and egress. Consistent with its prior opinion, the court declares the right-of-way agreements unambiguous now for this phase of decisions. Trunkline's right to install any additional pipelines that need not be parallel to the existing pipeline, right to alter the course of the existing 100 Line, and right to ingress and egress vis-à-vis these future rights cannot be fixed today to a certain location or width, and thus the one easement remains floating for the purposes reserved in these express grants.

Accordingly, the court GRANTS IN PART summary judgment for Trunkline as to the fixation of its reserved, future, moveable, and not yet exercised rights, and DENIES IN PART summary judgment for Trunkline as to the fixation of the corridor surrounding the 100 Line for that one use [ECF 221]; and DENIES summary judgment for the Dicksons and Close Armstrong [ECF 212], leaving again the only genuine factual issue for a bench trial. Because this decision may alter the world in which evidence bears on trial, the court DENIES with leave to renew Trunkline's motion to exclude opinion testimony [ECF 211]. By separate order, the court will set a Zoom scheduling conference to address scheduling and next steps after conferring with counsel.

SO ORDERED.

March 31, 2023                                          *s/ Damon R. Leichty*
                                                        Judge, United States District Court